Henry R. SILVERMAN; Peter F. Edelman; Adrian B. Werner; HRS/Dallas Parc, Inc.; PFE/Dallas Parc, Inc.; and ABW/Dallas Parc, Inc., Plaintiffs,

v.

WORSHAM BROTHERS CO., INC. and Earl S. Worsham, Defendants.

No. 84 Civ. 5063 (RWS).

United States District Court, S.D. New York.

Jan. 6, 1986.

Law Offices of Russel H. Beatie, Jr. (Russel H. Beatie, Jr., Eric R. Finkelman, New York City, of counsel), for plaintiffs.

Rogers & Hardin, P.C. (John J. Almond, Atlanta, Ga., of counsel), for defendants.

## OPINION

SWEET, District Judge.

This diversity action was brought by plaintiffs Henry R. Silverman ("Silverman"), Peter F. Edelman ("Edelman"), Adrian B. Werner ("Werner"), HRS/Dallas Parc, Inc., PFE/Dallas Parc, Inc., and ABW/Dallas Parc, Inc. (the "general partners") against Worsham Brothers Co., Inc. and Earl S. Worsham ("Worsham"), their former partners, seeking recoveries of moneys spent in the unsuccessful real estate transaction, the development of the River Parc Hotel in Miami, Florida. River Parc was initially contemplated to be a European-style luxury hotel. After jurisdictional motions, a bench trial was held on September 11 and 12 and the matter finally submitted on October 25, 1985 by able, experienced and helpful counsel. Based on the following findings and conclusions of law, judgment will be entered against Worsham in the amount of $102,385.04, with interest.

The parties to this action are sophisticated and generally successful real estate developers. Notwithstanding, under the pressure of events to be described, at the eleventh hour they sought to resolve certain of their differences with respect to the development of the hotel and created a document partly handwritten which gave rise to this lawsuit. The facts though complicated by the nature of the transaction are in general not in dispute.

Silverman resides in the City and State of New York and is the sole stockholder of HRS/Dallas Parc. Werner resides in Stamford, Connecticut and is the sole stockholder of ABW/Dallas Parc, and was project manager of the River Parc Hotel. Edelman is an individual who resides in the City and State of New York and is the sole stockholder of PFE/Dallas Parc. HRS/Dallas Parc, ABW/Dallas Parc, PFE/Dallas Parc are subchapter S corporations, duly organized and existing under the laws of the state of Florida, formed by the respective plaintiffs as stockholders for the purpose of acting as general partners of Dallas Parc Associates, Ltd. ("Dallas Park Associates"), the limited partnership formed to develop the River Parc Hotel.

HRS/Dallas Parc held 10% of Dallas Parc Associates, ABW/Dallas Park held 35% and PFE/Dallas Parc held 35% of the general and Class B limited partners' interest in Dallas Parc Associates.

In the late seventies, the parties became known to each other as participants in the development of the Miami Center project, part of which involved the construction of the Miami Hyatt Regency for which Werner was the project manager. Werner had prior experience in this role, Silverman and Edelman were also real estate developers, a field which Worsham also entered after operating successful contracting businesses in Tennessee. In 1981, the parties became aware of the availability for purchase of the Bauder Fashion College, a site in downtown Miami. All agreed it would be suitable for the development of a luxury hotel. It is not necessary to determine the initiator of the project for by the summer of 1981 an oral agreement was reached to proceed. The site was placed under contract by use of a loan collateralized by a $500,000 certificate of deposit pledged by Worsham.

Worsham Bros. is a Tennessee corporation with its principal place of business in Atlanta, Georgia. Worsham Bros. was a Class B limited partner in Dallas Parc Associates, holding 35% of the general and Class B limited partners' interest in Dallas Parc Associates. Worsham resides in Atlanta, Georgia and is a chairman of Worsham Bros. A separate Limitation Agreement among the general and Class B limit-

ed partners was entered dated August 16, 1982 ("Limitation Agreement"). Worsham personally guaranteed the obligations of Worsham Bros. under the Limitation Agreement.

In 1981, Worsham became aware that the Bauder Fashion College, a building in downtown Miami, was available for purchase and concluded it would be appropriate to develop this building into a luxury deluxe hotel in Miami and conferred with Silverman, Edelman, and Werner with whom he had a relationship arising out of the development of the Miami Hyatt. All the parties were influenced by the prosperity then enjoyed by Miami as a banking and financial center for many wealthy foreign businessmen.

The day after Labor Day, 1981, Worsham was able to obtain a $500,000 loan from the Southeast First National Bank in Miami, secured by the pledge by Worsham Bros. of a $500,000 certificate of deposit owned by Worsham Bros. It was agreed that each of the partners would be responsible for one-quarter of the loan (or $125,000), and would put up his share of the collateral. The other three partners—Werner, Silverman and Edelman—did not put up any money for their shares, however, and the bank eventually foreclosed upon Worsham Bros.' $500,000 certificate of deposit to satisfy the loan.

The parties continued to be unable to reach an agreement either with respect to their aliquot shares or even to sign a partnership agreement as to the property. To protect its investment, Worsham Bros. had to put additional monies into the property until, all told, it had invested about $850,000 in it. Eventually, through the brokerage efforts of Edelman, a financial broker, outside investors were attracted to the hotel project and construction financing was obtained from a troika of banks—the Florida National Bank, the Dime Savings Bank of New York, and the Buffalo Savings Bank (which later merged with the Goldome Bank for Savings). This financing, lined up in the summer of 1982, enabled the

parties to go forward with the hotel renovation project.

The parties formed a limited partnership by the name of Dallas Parc Associates, Ltd. Silverman, Werner, and Edelman determined to make Worsham Bros. merely a limited partner in the partnership and not a general partner, purportedly because, they said, one of the construction lenders did not want Worsham Bros. as a general partner. They never identified to Worsham or Worsham Bros. the identity of the person who had allegedly insisted that Worsham Bros. not be a general partner.

The various related transactions—the formation of the limited partnership, the closing of the construction loan, the funding of the contributions by the investors or Class "A" Limited Partners, the execution of the construction agreement, and the other subsidiary agreements—were closed more or less simultaneously on August 16, 1982. As a consequence, Worsham's collateral and expenses were repaid and the parties' various interests were governed by the agreements thus reached.

Silverman, Edelman, and Werner formed corporations to be the general partners of Dallas Parc Associates, Ltd. Worsham Bros. was the Class "B" Limited Partner, and the partnership, as originally formed, had twelve Class "A" Limited Partners. The General Partners each contributed a total of $100 in cash to the partnership and agreed to cause the land and the building, formerly owned by the oral partnership of Silverman, Edelman, Warner and Worsham, to be conveyed to Dallas Parc Associates. The Class "A" Limited Partners agreed to contribute a total of $1.65 million to the partnership over time on the following basis: They agreed to contribute $150,000 at closing; $900,000 on January 15, 1983; $450,000 on the later of "Renovation Completion" or January 15, 1984; and the last $150,000 on January 15, 1985, but in no event before the payment of the $450,000 contribution that was due on the later of Renovation Completion or January 15, 1984.

The Limited Partnership Agreement defined "Renovation Completion" as follows:

2.31 "Renovation Completion" shall mean the date on which all four of the following conditions have first been satisfied: (i) issuance of a temporary or permanent certificate of occupancy for the entire building, (ii) commencement of hotel operations, (iii) establishment of a working capital account and initial reserve account of $250,000 and $500,000, respectively, and (iv) funding of the Permanent Loan.

The original project budget called for completion and renovation of the hotel for a total price of $19,150,000 of which $3.9 million was earmarked for construction costs; $2.94 million for the furnishings, fixtures, and equipment (or "FF & E"); $8 million for the acquisition of the land and building; $216,000 for brokerage fees in connection with the acquisition of the land and building; $386,500 for financing fees, including the origination fee for the construction loan and for the permanent loan (as to which Dime and Goldome had issued a permanent loan commitment); $1,475,000 for construction loan interest; $375,000 for professional fees (architectural, legal, accounting, etc.); $375,000 for pre-opening hotel expenses, promotion, and advertising; $200,000 for "reimbursables and overhead"; $750,000 for hotel start-up working capital; and $481,000 for contingency reserve for other fees and expenses.

The sources of the funds under the original budget were as follows: The Florida National, Dime Savings, and Goldome construction loan in the amount of $15 million; $2.5 million in installment financing for the purchase and installation of FF & E (for which the FF & E supplier would be taking back a chattel mortgage on the furnishings, fixtures and equipment); and $1.65 million in Class "A" limited Partner capital contributions.

The construction agreement with the general contractor, Nico Construction, called for a target date of April 1, 1983 for substantial completion of the renovation. Werner's company, Adrian Werner & Associates, Inc., was to be the project manager responsible for managing the renovation development.

The parties' main security against liabilities was the prospect of the permanent loan which, in connection with the August 16, 1982 closing, the Dime Savings Bank and the Goldome Bank committed to provide to the limited partnership upon completion of the renovation in accordance with the construction contract documents. The permanent loan, which was to be in the amount of the original construction loan, was not to be personally guaranteed by any one. Since the only project financing that was intended to be guaranteed was the construction loan (which loan would be repaid from the proceeds of the permanent loan), the closing of the permanent loan would have eliminated any personal exposure of the individuals on any loan guarantees. The originally-planned $2.5 million FF & E chattel mortgage financing was not to be personally guaranteed.

Demolition on the Bauder building commenced in September of 1982, and lasted approximately four and a half months. Construction began in February of 1983, and was substantially completed by September of 1983. While construction was underway, the project met its first major hurdle. The Italian company, which was providing the marble and furniture for the hotel, and which was to provide the $2.5 million loan for furniture, fixtures, and equipment at an extremely favorable rate, reneged on its commitment. The plaintiffs were compelled to explore alternative sources of funding to replace this FF & E loan and in August of 1983 Silverman, Edelman and Werner were forced to obtain a $2.5 million increase and an extension of the construction loan from the banks to replace the FF & E loan and they were required to give their personal guarantees for this loan.

Although the banks had committed to provide the permanent loan, the completion of the project in accordance with the loan documents, lien-free, was a precondition to the funding of the permanent loan. The

hotel received its temporary certificate of occupancy in September, 1983 and commenced operations. By October 31, 1983, the partnership expended all monies allotted under the development budget for the payment of construction loan interest. With completion of the hotel several months away, it followed that the funding of the permanent loan, which was conditioned upon completion of the hotel, was several months away.

The delayed completion, in combination with the opening of the hotel, created serious problems for the partnership. Operating within a development budget that did not budget for construction loan interest payments beyond October, the partnership faced construction loan interest obligations beyond the development budget and, beginning in September, 1983, hotel operating losses.

At the same time, the hotel market in Miami began a disasterous turn for the worse. As a result of a decline in oil prices, rioting and civil unrest in Miami, the Miami hotel market fell off drastically. Hotel occupancy fell off about 25% in Miami in general, and the River Parc Hotel, planned as a luxury hotel to accommodate the many wealthy Latin American and other visitors who had been coming to the city in great numbers, was particularly hard hit since it required a 70% occupancy rate in order to break even. The actual occupancy was averaging at around 20%.

The demand notes with which the three plaintiff corporations were financed were called, and the proceeds were used to meet the operating expenses of the hotel in the amount of $473,000. Silverman, Werner and Worsham personally guaranteed a line of credit which was obtained at Florida National Bank. Approximately $400,000 was drawn on this line of credit to meet liabilities of the River Parc Hotel.

In his memorandum of December 12, 1983, Werner reported:

Of the $19,500,000 [the total development budget], a total of $18,892,985 has been drawn to date. This includes interest earned and the proceeds of selling scraps off the job. Of this amount, $18,286,655 has been disbursed in accordance with the print-out, leaving $606,330 theoretically undisbursed but reported on the printout. Of this amount, $517,000 has been diverted to pay operating losses, leaving $88,622 cash on hand and a liability of $606,330 to vendors for which the funds have been drawn from the bank but not disbursed to these vendors.

In the same memorandum, Werner reported that the California Federal permanent loan commitment was to be received that week (the week of December 12, 1983), which would produce some $300,000 in excess funds—that is, excess of the $17.5 million in financing provided by Dime Savings and Goldome and that the project was to be completed within the development budget. However, a number of FF & E items, including the swimming pool deck, the employee cafeteria, the maintenance shop, the health club, and the walkway to the Knight Convention Center, had not been constructed and eventually were abandoned.

By the time California Federal negotiations fell through, the partnership had a $600,000 arrearage on construction loan interest payments. Dime Savings and Goldome apparently expressed willingness to close the permanent loan if Dallas Parc Associates paid up the $600,000 arrearage in order to bring the debt service current. Dallas Parc Associates did not pay the arrearage on the construction loan and did not remove the liens on the property, and, hence, the permanent loan never closed.

Beginning in January, 1984, Silverman, Edelman and Werner began advancing their own monies directly to the partnership to cover operating deficits or losses of the River Parc Hotel. Silverman reported by letter of January 26, 1984, that he, Edelman and Werner "have advanced $300,000 to [Dallas Parc Associates] to pay operating expenses for the past several weeks in order to keep the River Parc's doors open." By the end of March, 1984, they had made a total of $473,000 in ad-

vances to the partnership for operating expenses of the hotel.

The plaintiffs also advanced $109,890.24 for "Taxes—payroll related" which they themselves categorize as payments towards "operating deficits." They also made payment of a settlement described as "FSB—Legal—Garber, Goodman Settlement" in the amount of $17,000. All told, plaintiffs claim to have advanced $599,-890.24 towards hotel operating deficits.

The plaintiffs requested that defendants Worsham and Worsham Bros. pay their share of all liabilities and operating expenses as required under the Limitation Agreement which demand was refused. The River Parc Hotel was foreclosed upon in April of 1984.

In a settlement agreement with the Banks, the plaintiffs paid the Banks $400,-000 plus approximately $80,000 in taxes, in exchange for an agreement that the Banks would not seek a default judgment against the plaintiffs in the event that the proceeds from the foreclosure were insufficient to satisfy the amount of the partnership's liability to the Banks which plaintiffs had personally guaranteed.

At a foreclosure sale in April, 1984 to which the public was invited to attend and submit bids, the hotel was sold to the construction lender for an amount equal to the outstanding principal and interest on the loan, and the costs and expenses of the Banks. This amount was less than $20,-000,000 and less than the value of the River Parc Hotel property.

On February 25, 1984, Worsham and Worsham Bros. concluded a settlement with Werner and his company, Adrian Werner & Associates, Inc., whereby Werner received $440,000 (out of the proceeds of a sale of an ownership interest in the Miami Hyatt Hotel) and, in connection with that settlement, Werner and his company gave general releases to Worsham and Worsham Bros. In those releases, Werner released Worsham and Worsham Bros:

> From all, and all manner of action and actions, causes and causes of action, suits, debts ... contracts, controversies, agreements, ... claims and demands whatsoever, in law or in equity, which said first party [Werner] ever had, now has, or ... hereafter can, shall, or may have ... for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of these presents.

The monies from this settlement went into an escrow fund established under an escrow agreement of the same date, February 25, 1984. Under that escrow agreement, those funds were to be used in large part to fund certain indemnities running from Werner and in favor of Silverman in relation to the River Parc Hotel. On June 6, 1984, this lawsuit was initiated.

### Conclusion

■ Federal jurisdiction over this action is founded upon diversity of citizenship pursuant to 28 U.S.C.A. § 1332(a)(1). A federal court in a diversity suit must apply the choice of law rules of the forum state court. *Day Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electro Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Hence, in this case, New York's conflict of law rules control.

■ Under New York law, the law of the state having the most significant relationship to the matter in controversy governs contract disputes in the absence of an effective choice by the parties. *Duplan Corp. v. W.B. Davis Hosiery Mills*, 442 F.Supp. 86, 88 (S.D.N.Y.1977); *Teledyne Industries, Inc. v. Eon Corporation*, 373 F.Supp. 191, 200 (S.D.N.Y.1974); *Auten v. Auten*, 308 N.Y. 155, 124 N.E.2d 99 (1954). As the agreements were executed in Florida and the hotel was renovated and to be operated in Florida, and as three of the plaintiffs are corporations duly organized and existing under the laws of Florida, Florida is the state having the most significant relationship to the matter in controversy. Thus, the contract is governed by Florida law.

Under Florida law, "[t]he general principle adopted by civilized nations is, that the nature, validity and interpretation of contracts are to be governed by the *lex loci* of the country where the contracts are made or are to be performed; but the remedies are to be governed by the *lex fori.*" *Goodman v. Olsen*, 305 So.2d 753, 757 (Fla.1975); *Wingold v. Horowitz*, 292 So.2d 585, 586 (Fla.1975). Thus the validity and interpretation of the August 16, 1982 agreement and indemnification letter, for breach of which the plaintiffs seek relief, are governed by Florida law, and the remedies for breach are governed by the law of New York.

Paragraph 3 of the Limitation Agreement specifies three types of "liabilities," including all obligations set forth in the Partnership Agreement, "all liabilities for which Edelman, Silverman and Werner could be personally liable in connection with this transaction except operating expenses ..." and $200,000 in operating expenses. Paragraph 5 defines the limits of this liability, "$125,000 for Worsham for the liabilities and his proportionate share of the $200,000 operating deficit requirement without regard to the above limitation."

The questions thus presented are: (1) did Silverman, Edelman and Werner incur liabilities in connection with the project; (2) were payments made for operating deficits to trigger Worsham's obligation to provide $40,000; (3) did the plaintiffs breach any agreements to Worsham thus voiding any obligation on his part, or giving rise to a liability to Worsham, and (4) what are the damages, if any.

As to liabilities paid by the plaintiffs, the facts found above establish liabilities which the plaintiffs "could be personally liable in connection with this transaction," apart from their obligations set forth in the closing documents. These include the bank loan, interest, and the settlement of the banks' claims in excess of $900,000. Worsham's liability for his limited amount is triggered unless defeated by plaintiffs' breach or recalculated by virtue of the Worsham release. As determined below,

"operating deficits" have a precise, post renovation measuring, and to exclude these sums as operating expenses does not exclude the amounts paid as liabilities.

The only serious breach of contract by Werner urged by Worsham relates to the use of construction loan funds for what would be generally categorized as operating expenses after the hotel opened and before the renovation date was achieved. Worsham points to no provision of the agreement between the parties that was violated and no agreement to which Dallas Parc Associates was party which was violated. Indeed, the proposed budget allocations were altered, but there is no claim that such a shift constituted conversion. Indeed, there was unrebutted testimony that such use of construction funds was a common industry practice.

The remaining acts described as breaches are best categorized as the effects of an inability to perform resulting primarily from the economic conditions but in any event giving rise to no defense to Worsham. Indeed, it was in contemplation of just such events that caused the preparation of the Limitation Agreement.

Worsham's interpretation of the Limitation Agreement would restrict its coverage only to operating expenses and thus vitiate the parties' expressed intention that each would pay a share, limited to $125,000, of the liabilities. The Limitation Agreement included by its terms both categories of payments. In this regard, one principal expressed concern specifically related to the guarantees of the individual plaintiffs of the construction loan.

Worsham relies on certain principles of Florida law with respect to the duties surrounding indemnification and contribution. The cases cited by Worsham are distinguishable either because they are applying principles of implied indemnity law, *see Parfait v. Jahncke Service, Inc.*, 484 F.2d 296, 304 (5th Cir.1973) or else are construing indemnity contracts having different provisions, such as a right to notice of claims or settlements. *See Wright v. Fidelity & Casualty Co. of New York*, 139

So.2d 913 (Fla.App.1962). However, the indemnification claim in this case must be evaluated according to the terms of the Sharing Agreement between the parties which requires no notice to the indemnitor. In the absence of a specific notice provision, Florida law does not require that the indemnitor be notified to come in and defend against a claim as a condition precedent to recovery. *Crystal River Enterprises, Inc. v. NASI, Inc.*, 399 So.2d 77 (Fla.App.1981).

Since the Sharing Agreement provides for indemnification of "all liabilities for which Edelman, Silverman and Werner could be personally liable," it encompasses payments of claims based on potential as well as actual liability. The Limitation Agreement is by its terms a modification of the previously formed "oral partnership agreement" and represents simply one aspect of the relationship between the parties, the sharing of any losses, in addition to the other closing agreements. Therefore, it would be inappropriate to interpret the term "liability" in an overly technical fashion as urged by Worsham. Instead, the "plain meaning" of that word as used in the Limited Agreement and adopted herein is appropriate under Florida law. *See Cueto v. Allmand Boats, Inc.*, 334 So.2d 30, 32 (Fla.1976). Only if the payments made by the plaintiffs were mere "volunteers" could Worsham escape his indemnification obligation and that has not been demonstrated. Plaintiffs' payment of $400,000 to the Banks was not voluntary since it was made to avoid the possible liability of foreclosure deficit. Although the sales price actually satisfied the full obligation, that factor is only one element which a Florida court would evaluate in determining whether to dismiss a deficiency judgment. *See Spencer v. American Advisory Corp.*, 338 So.2d 62, 63 (Fla.App. 1976).

Even if the indemnity agreement was broadly construed as creating a duty of good faith on the part of the contracting parties, there is no demonstration that the plaintiffs violated any such duty. All the funds spent and categorized as liabilities were unquestionably spent in an effort to maintain the viability of the hotel, a purpose to which the Limitation Agreement specifically addressed itself, and were required of the plaintiffs, practically, for that purpose.

■ With respect to Werner's claim, there is no meaningful ground offered by Werner to invalidate the general release given on February 25, 1984. While it may be that Worsham drove a hard bargain and that Werner was entitled to more arising out of his interest in the Hyatt Regency project, nonetheless, all claims against Worsham were released. A delay of two years in the resolution of Werner's claim against Worsham does not qualify as duress and no authority is cited by Werner for the proposition. The plaintiffs concede in their post-trial memorandum (page 19) that, if the release is effective, Worsham's $125,000 limited liability is reduced to $102,385.04 by the reduction of Werner's share.

■ As to plaintiffs' claim regarding Worsham's alleged share of the operating expenses, such claim will be denied since it would allow a recovery not contemplated by the Limitation Agreement. Plaintiffs seek contribution for payment described as being for "operating deficits."

Under the Limitation Agreement, the parties expressly excluded from the definition of "Liabilities" any payments or obligations for operating deficits. The parties' sharing obligation with respect to any operating deficits is spelled out at the end of paragraph 3 of the Limitation Agreement. Under this provision, the parties must bear "their proportionate share of the $200,000 of operating deficits which is required under the Partnership Agreement."

This provision by its terms refers back to Section 29 of the Partnership Agreement, which defines the obligations of the partners for any operating deficits or operating expense liabilities. Under Section 29 of the Partnership Agreement, no party has any obligation to fund any operating deficits until "Renovation Completion":

29.1 If, at any time subsequent to Renovation Completion but prior to December 31, 1985, there is negative Cash Flow (i.e., there are cash deficits from the operation of the Project after application of all available sums from the reserve accounts described in Article 6 and the proceeds of any loans permitted under Article 12), then the General Partner shall promptly notify all Partners of this fact (the "Deficit Notice") ... Within ten (10) days after the Deficit Notice is given, each General Partner shall contribute his pro rata share of the deficits to the Partnership (the "Deficit Loans") in proportion to his interest as set forth in Section 12.4 ... In no event shall the General Partners be required to make Deficit Loans in excess of the aggregate sum of $200,000.

Renovation Completion is defined in Section 2.31 of the Partnership Agreement to be a date following the satisfaction of four conditions, including issuance of a certificate of occupancy, commencement of operations, establishment of capital accounts, and the funding of the permanent loan. Thus, Renovation Completion could not be achieved until the funding of the Permanent Loan. In this case, the Permanent Loan never funded. Hence, Renovation Completion was never achieved and no obligation or liability arose on the part of the partners to fund any operating deficits as that term is defined by the Limitation Agreement.

Judgment will be entered in favor of Silverman and Edelman in the amount of $102,385.04, with interest. Submit judgment on notice.

IT IS SO ORDERED.