Peter TISCHMANN, Plaintiff,

v.

**ITT/SHERATON CORPORATION,
Defendant.**

**No. 92 Civ. 2505 (SWK).**

United States District Court,
S.D. New York.

April 10, 1995.

---

Eckhaus & Olson by Steven G. Eckhaus, Jonathan C. Moore, New York City, for plaintiff.

Jacob, Medinger & Finnegan by Peter A. Cross, Max H. Crohn, Jr., Jamie Andra Gavrin, Jun Chul Whang, New York City, for defendant.

## *MEMORANDUM OPINION AND ORDER*

KRAM, District Judge.

In this diversity action arising out of an allegedly wrongful termination of employment, defendant ITT/Sheraton Corporation ("Sheraton") moves, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing the amended complaint. Plaintiff Peter Tischmann ("Tischmann") opposes the motion. For the reasons set forth below, Sheraton's motion is granted in part and denied in part.

### BACKGROUND [1]

#### I. The Parties

Defendant Sheraton, a Delaware corporation headquartered in Massachusetts, owns and operates one of the leading hotel chains in the world. The St. Regis Hotel (the "St. Regis") is Sheraton's flagship hotel in New York City.

In 1972, Tischmann commenced employment at Sheraton, working in various positions for approximately twenty years. In July 1985, after working at several Sheraton hotels around the world, Tischmann was appointed general manager of the St. Regis. As general manager, Tischmann's responsibilities included managing the St. Regis staff and supervising the hotel's daily operations.

Initially, Tischmann served as general manager pursuant to a written employment agreement dated November 24, 1986 (the

"Contract"). The Contract, covering the period of December 1, 1986 through November 30, 1988, provided a base salary of $92,000 per year. In addition to his base salary, Tischmann received: (1) substantial performance bonuses; (2) a rent-free apartment; (3) a partial college scholarship for his daughter; (4) participation in Sheraton's Investment and Savings Plan; (5) participation in Sheraton's Retirement Plan; (6) life insurance; (7) stock options; and (8) various other perquisites. The Contract expressly provided that the "agreement will be governed by and construed in accordance with laws of the State of Massachusetts." Contract, annexed to Pl.'s Resp. to Def's Rule 3(g) Statement as Exh. "7," at 3.

Tischmann was also eligible to participate in Sheraton's Incentive Compensation Plan (the "Incentive Plan"). Under the Incentive Plan, general managers were awarded bonuses commensurate with the performance of their hotels. The Incentive Plan defined successful management as "encompass[ing] both achievement of your own individual objectives and contribution as a team member toward overall ITT Sheraton objectives." Incentive Plan, annexed to Def.'s Exhibits as Exh. "18," at 1.

Sheraton and Tischmann renewed the Contract for two one-year periods, effectively extending the Contract through November 30, 1990. At that time, however, Sheraton decided not to enter into or extend employment contracts with any of its employees. *See* Affidavit of James P. Smith, sworn to on 4/14/94, at ¶ 15. As a result, the Contract expired on November 30, 1990 and Tischmann continued to work at Sheraton without a written employment agreement.

#### II. The Severance Plan

In the absence of an employment agreement, however, Sheraton created a Special Executive Severance Pay Plan (the "Severance Plan") to cover certain Sheraton executives, including Tischmann, in the event of involuntary termination. The Severance Plan provided: "If the Company terminates

---

1. Unless otherwise indicated, the following statement of undisputed facts is derived from Defendant's 3(g) Statement of Material Facts and

Plaintiff's Response to Defendant's 3(g) Statement of Material Facts.

an Executive's employment, the Executive shall be provided severance pay in accordance with the terms of this Plan except where the Executive . . . is terminated for cause." Severance Plan, annexed to the Def.'s Exhibits as Exh. "16," at 1. Payment under the Severance Plan would be "paid in the form of periodic payments according to the regular payroll schedule . . . provided that ITT reserves the right at any time to pay the remaining severance pay in the form of a discounted lump sum." *Id.* The Severance Plan provided further:

> If during the period an Executive is receiving Salary Continuation, the Executive (i) engages in any activity which is inimical to the best interests of the Company; . . . or (vi) fails to comply with applicable provisions of the ITT Code of Conduct or applicable ITT Corporate Policies or any applicable ITT Subsidiary Code or policies, then the Company will have no further obligation to provide severance pay.

*Id.* at 3. The Severance Plan also noted that it is "not a contract of employment, does not guarantee the Executive employment for any specified period and does not limit the right of the Company to terminate the employment of the Executive at any time." *Id.* at 5.

### III. Sexual Harassment Charges

During the relevant time period, Sheraton had in place a Code of Corporate Conduct (the "Code of Conduct") as well as a policy against sexual harassment (the "Sexual Harassment Policy"). The Code of Conduct provided, in relevant part:

> Sexual harassment in any form will not be tolerated. All supervisors, managers, and executives of ITT must be alert to the possible presence of sexual harassment in the workplace, take appropriate steps to prevent it, and take action if such harassment occurs. Appropriate action may range from the issuance of a warning to dismissal.

Code of Conduct, annexed to Def.'s Exhibits as Exh. "6," at 5. The Sexual Harassment Policy, printed in Sheraton's Personnel Policy and Procedure Manual (the "Personnel Manual"), stated:

> It will be the responsibility of the management team of each hotel to ensure that all hotel employees are allowed to work in an environment free of sexual harassment. Hotel staff will be informed of this policy and made aware of what steps to take if they feel they are being harassed. When notified of an alleged violation, management will react immediately, investigate the allegation(s) and take appropriate action. It should be made clear to all staff members that sexual harassment will not be tolerated.

Sexual Harassment Policy, annexed to Def.'s Exhibits as Exh. "8."

In July 1988, the St. Regis closed for extensive renovations and Tischmann and other St. Regis staff worked at the Sheraton Center in New York City on assignments related to the anticipated re-opening of the St. Regis in September 1991. At that time, Sheraton decided to name Tischmann as managing director of the newly-renovated St. Regis. Shortly thereafter, Tischmann hired other management-level employees, including Ann Power ("Power") for the position of director of human resources and Sarah Cannon ("Cannon") for the position of assistant director of human resources.

In February 1992, Mary Ann Palmer ("Palmer"), Sheraton's vice president and director of human resources for Sheraton North America–East, notified James P. Smith ("Smith"), Sheraton's executive vice president and director of administration, that Power and Cannon had come forward with complaints that Tischmann had sexually harassed them at work.

Power and Cannon were instructed to submit written statements to Smith, describing their allegations in detail. In her written statement, Power alleged six separate incidents in which Tischmann had either touched her buttocks, requested kisses, inquired about her sex life or otherwise behaved inappropriately. Similarly, Power's written statement alleged that Tischmann had touched her inappropriately and made several sexually suggestive remarks. Upon receiving the written submissions, Smith consulted with John Kapioltas ("Kapioltas"), Sheraton's president, who decided to assign

Carl J. Madda ("Madda"), Sheraton's vice president and director of labor relations, to investigate the charges against Tischmann.

On March 5, 1992, Madda began an on-site investigation at the St. Regis. Madda immediately advised Tischmann that he had been assigned to investigate sexual harassment complaints levied against him by certain female workers at the hotel. Madda proceeded to interview Power and Cannon, who described several incidents of sexual harassment perpetrated by Tischmann.

During the investigation, Madda interviewed other St. Regis employees, including Eleanor Ribaudo and Anne Barzola, who complained that Tischmann had engaged in unwelcome conduct towards them as well. Madda also interviewed two other management-level employees at the St. Regis, who confirmed certain of Power's and Cannon's accounts. At about the same time, Denise Flanders ("Flanders"), a former Sheraton employee, came forward with complaints of similar conduct by Tischmann. On March 6, 1992, Madda compiled the results of his investigation and submitted a written report to Smith.

Smith reviewed Madda's report with Kapioltas, who decided that Sheraton's personnel committee, composed of several members of Sheraton's board of directors, should consider the charges and determine an appropriate remedy. On March 12, 1992, the personnel committee, reviewed the charges against Tischmann. The personnel committee determined that the charges were credible and, as Tischmann's conduct was in violation of the Code of Conduct and the Sexual Harassment Policy, his employment should be terminated.

After the meeting, Ralph W. Pausig ("Pausig") and Smith, two members of the personnel committee, met with Power and Cannon separately as a final verification of their allegations. Pausig and Smith then confronted Tischmann with the charges and terminated

his employment. Although Sheraton claims that Tischmann did not dispute the substance of the complaints, Tischmann maintains that he consistently has denied all allegations of sexual harassment.[2] *See* Deposition of Peter Tischmann, undated, annexed to Def.'s Rule 3(g) Statement as Exh. "3," at 348.[3]

In addition to terminating Tischmann's employment, Sheraton determined not to pay him any bonus under the Incentive Plan for 1991. According to Sheraton, as the St. Regis was under construction throughout most of 1991, it could not calculate Tischmann's bonus based on the hotel's performance, but instead was forced to base his bonus on personal performance. In light of Sheraton's determination that Tischmann had violated the Code of Conduct and the Sexual Harassment Policy, it decided that a bonus under the Incentive Plan was not warranted. Tischmann disputes this claim and points out that, prior to the harassment charges, Sheraton had determined that he had achieved all goals for 1991 and should receive a bonus in the amount of $34,100 under the Incentive Plan.

Similarly, Sheraton decided not to extend any severance pay pursuant to the terms of the Severance Plan. Specifically, Sheraton concluded that its obligation to pay severance was discharged by Tischmann's violation of Sheraton policy. Tischmann disputes the underlying sexual harassment claims, however, and argues that there were no grounds for Sheraton's decision to deny him severance pay.

## IV. Alleged Disclosures

Shortly after Tischmann's discharge, accounts of the dismissal appeared in the press. The parties dispute the source of these press accounts and whether Sheraton may be held responsible for any alleged disclosures. According to Sheraton, Tischmann was the first

---

2. On January 11, 1993, an Administrative Law Judge for the New York State Department of Labor determined that Tischmann's alleged conduct "did not constitute sexual harassment." *See* Department of Labor Decision, annexed to Pl.'s Resp. to Def.'s Rule 3(g) Statement as Exh. "1."

3. Although both parties have submitted excerpts from Tischmann's deposition testimony, neither party has provided the Court with that portion of the transcript indicating the date of the deposition. The parties are reminded to submit complete information for sources upon which they intend to rely.

person to disclose the fact that his employment had been terminated as a result of sexual harassment charges. Specifically, Sheraton alleges that Tischmann immediately informed his secretary and another St. Regis employee of the reason for his termination. Tischmann disputes this claim and contends that Sheraton employees, including Madda and Cannon, informed a dozen other Sheraton employees as well as several non-Sheraton employees about the allegations prior to the time that any disclosures were made by him.

Sheraton maintains further that it did not disclose the specific reason for Tischmann's termination despite several inquiries from the press. Rather, Sheraton decided to adopt a public position that Tischmann was discharged due to a change in management. For example, an article appearing in *Crain's New York Business* ("*Crain's*") reported that Sheraton "won't comment on Mr. Tischmann's departure, and claims that the St. Regis is meeting its projections." *See Crain's* Article, annexed to Def.'s Exhibits as Exh. "32." Similarly, in response to a request from the *New York Observer* to confirm a forthcoming article revealing that sexual harassment allegations had been lodged against Tischmann, Sheraton stated:

> We are not defining the management decision as actual dismissal. As well, the decision [to discharge] was made after careful and deliberate consideration by the senior management of ITT Sheraton. We are satisfied and we are confident that all steps were taken to ensure fairness to all parties involved and to ensure the continuance of high level performance at the St. Regis.

*See New York Observer* Inquiry, annexed to Def.'s Exhibits as Exh. "28," at 2. According to Tischmann, however, Sheraton's failure to deny specific questions by reporters regarding allegations of sexual harassment implicitly confirmed the sexual harassment charges.

## V. The Present Action

On March 9, 1993, Tischmann filed the instant amended complaint seeking reinstatement, compensatory and punitive damages, costs and attorneys' fees. The gravamen of the amended complaint is that Sheraton's stated reason for discharging Tischmann is pretextual and that, in fact, Sheraton sought to remove Tischmann from his position to (1) save money by reducing its work force; (2) mislead Sheraton's stockholders and the financial community;[4] and (3) oust an individual whose management style, age and national origin did not project the proper business image. *See* Amended Complaint at ¶¶ 21, 22, 24–27.

The amended complaint sets forth eleven causes of action for: (1) breach of contract (First Claim for Relief); (2) breach of an implied covenant of good faith and fair dealing (Second Claim for Relief); (3) wrongful discharge in violation of public policy (Third Claim for Relief); (4) intentional infliction of emotional distress (Fourth Claim for Relief); (5) negligent infliction of emotional distress (Fifth and Seventh Claims for Relief); (6) breach of promise to pay severance and pension benefits (Sixth and Eighth Claims for Relief); (7) denial of wages under New York Labor Law § 190 *et seq.* (Ninth Claim for Relief); (8) slander (Tenth Claim for Relief); and (9) compelled self-publication defamation (Eleventh Claim for Relief).[5]

Sheraton now moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing the amended complaint. The Court shall address Sheraton's motion with respect to each claim in turn.

## DISCUSSION

### I. Standard of Law

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admis-

---

4. In brief, Tischmann alleges that stockholders were concerned about the size of compensation packages available to Sheraton senior executives. According to Tischmann, discharging him deflected criticism away from Sheraton's poor performance in managing its hotels.

5. Although in his Opposition Memorandum of Law, Tischmann refers to an additional claim for intentional interference with his contractual relations, no such claim appears in the amended complaint.

sions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and may discharge this burden by demonstrating to the court that there is an absence of evidence to support the nonmoving party's case on which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmoving party then has the burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed. R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552.

The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1187 (2d Cir.1987); *Eastway Constr. Corp. v. New York,* 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. at 158–59, 90 S.Ct. at 1607–09; *Gallo v. Prudential Residential Serv.,* 22 F.3d 1219, 1223 (2d Cir.1994). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *see Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 12–15 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Argus Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

To determine whether the moving party has met his or her burden, the court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.,* but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of summary judgment. *See, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to establish his or her burden under Rule 56. *Celotex Corp. v. Catrett,* 477 U.S. at 330 & n. 2, 106 S.Ct. at 2556 & n. 2 (Brennan, J., dissenting). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)).

## II. Choice of Law

As a threshold matter, the Court must determine whether Massachusetts or New York state law applies to plaintiff's claims. Tischmann argues that Massachusetts law governs on the grounds that (1) the expired Contract expresses the parties' mutual intent to apply Massachusetts law; or (2) even in the absence of mutual intent, New York's traditional choice of law rules require the application of Massachusetts law. The Court disagrees.

A federal court in a diversity case must look to the choice of law rules of the state in which it sits to resolve conflict of law issues. *AroChem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 269–70 (2d Cir.1992) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941)); *G.D. Searle & Co. v. Medicore Communications, Inc.,* 843 F.Supp. 895, 905 n. 5 (S.D.N.Y.1994). Thus, the Court must examine New York's choice of law principles to determine whether to apply Massachusetts or New York law to Tischmann's claims.

In determining the law that governs the contractual relationship between the parties, New York courts apply a "paramount interest" test, under which the court must apply the law of the state with the "greatest interest in the litigation." *Crescent Oil & Shipping Servs., Ltd. v. Phibro Energy, Inc.,* 929 F.2d 49, 52 (2d Cir.1991). In determining which state's interest is paramount, "the facts or contacts which obtain significance ... are those which relate to the purpose of the particular law in conflict." *Hutner v. Greene,* 734 F.2d 896, 899 (2d Cir.1984). With respect to employment contracts, "the matters of performance and breach are to be determined by the law of the place of performance, or, in the alternative, by the law of the state having the most significant contacts with the matter in dispute." *Frishberg v. Esprit De Corp.,* 778 F.Supp. 793, 801 (S.D.N.Y.1991) (quoting *Peters v. MCI Telecommunications Corp.,* 685 F.Supp. 411, 412 (S.D.N.Y.1988)), *aff'd,* 969 F.2d 1042 (2d Cir.1992).

Similarly, with respect to a plaintiff's claims sounding in tort, New York courts adopt an "interest analysis" test, requiring application of the law of the state with the greatest interest in the outcome of the litigation. *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 95, 480 N.E.2d 679, 684 (1985). The significant factors to be considered in tort actions are "almost exclusively, the parties' domiciles and the locus of the tort." *Id.* Of these factors, the locus jurisdiction "has the predominant interest where rules regulating conduct are at issue, because of its interest in affecting the conduct of those who act within the jurisdiction and of a reliance interest on the part of actors whose conduct is at issue." *AroChem Int'l, Inc. v. Buirkle,* 968 F.2d at 270 (citing *Schultz v. Boy Scouts of America, Inc.,* 491 N.Y.S.2d at 96, 480 N.E.2d at 685).

In the present case, the Court finds that Tischmann's claims sounding both in breach of contract and tort are governed by New York law. Tischmann is a New York domiciliary and worked in New York as a St. Regis employee. Most significantly, all of the incidents forming the basis for the amended complaint occurred in New York. Under these circumstances, it is clear that New York has the greater interest in determining the outcome of the litigation.

Tischmann's argument that the Contract evinces the parties' intent to apply Massachusetts is unavailing. While Tischmann is correct that contracting parties may select the body of law to apply to an agreement, *see Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984); *Curtis v. Harry Winston, Inc.,* 653 F.Supp. 1504, 1509 (S.D.N.Y.1987) (citing *Silverman v. Worsham Bros. Co.,* 625 F.Supp. 820, 826 (S.D.N.Y.1986)), the Contract upon which Tischmann relies expired more than fifteen months prior to the filing of the complaint. Tischmann is unable to offer any support for the proposition that parties are bound to the terms of an expired contract. Accordingly, the Court finds that New York law applies to Tischmann's claims.

### III. Breach of Contract

In his First Claim for Relief, Tischmann maintains that a contract of employment arose out of (1) unspecified language in the Personnel Manual; (2) the expired Contract; (3) Tischmann's reasonable expectations; and (4) unspecified verbal statements made by Sheraton executives that Tischmann could expect continued employment. According to Tischmann, Sheraton breached its contractual obligations when it discharged him in March 1992. The Court finds that this claim lacks merit.

Under New York law, "absent an agreement establishing a fixed duration, an employment relationship is presumed to be

hiring at will, terminable at any time by either party." *Sabetay v. Sterling Drug, Inc.,* 69 N.Y.2d 329, 514 N.Y.S.2d 209, 211, 506 N.E.2d 919, 920 (1987) (citing *Martin v. New York Life Ins. Co.,* 148 N.Y. 117, 121, 42 N.E. 416, 417 (1895)). An employer may discharge an at-will employee at any time with or without cause. *Allen v. City of Yonkers,* 803 F.Supp. 679, 709 (S.D.N.Y.1992) (citing *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1020–21 (2d Cir.1985)); *see also Jones v. Dunkirk Radiator Corp.,* 21 F.3d 18, 21 (2d Cir.1994) (stating that, under New York's employment at-will doctrine, "an employer has a nearly unfettered right to discharge an employee").

In the case at hand, the Court finds that Tischmann became an at-will employee on November 30, 1990 upon the expiration of the Contract. There is no support for Tischmann's claim that various documents and oral promises constructed an employment contract where none existed. In fact, documents such as the Incentive Plan expressly provided that they were not contracts of employment. The Court finds further that, in light of Sheraton's stated decision not to continue providing employment contracts, any isolated promises of continued employment are insufficient evidence of an express agreement to alter Tischmann's at-will status. *See, e.g., Cucchi v. New York City Off–Track Betting Corp.,* 818 F.Supp. 647, 652 (S.D.N.Y.1993) (rejecting plaintiff's attempt to portray oral promises of continued employment as binding agreement). As Tischmann was an at-will employee, Sheraton was entitled to terminate his employment with or without cause. Accordingly, Sheraton's motion for summary judgment dismissing the First Cause of Action is granted.

## IV. Implied Covenant of Good Faith

■ Tischmann's Second Cause of Action sets forth a claim for a breach of an implied covenant of good faith and fair dealing. This claim appears to be based upon Massachusetts law which curtails the ability of employ-

ers to discharge at-will employees without cause under certain circumstances. It is well-settled under New York law, however, that an implied covenant of good faith does not attach to employment contracts governed by New York law. *Peterson v. Insurance Co. of N. Am.,* 822 F.Supp. 1040, 1044 (S.D.N.Y.1993), *rev'd on other grounds,* 40 F.3d 26 (2d Cir.1994); *Sabetay v. Sterling Drug, Inc.,* 514 N.Y.S.2d at 212, 506 N.E.2d at 922; *Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86, 91 (1983). As the Court has determined that New York law applies in the instant case, Sheraton's motion for summary judgment dismissing the Second Claim for Relief is granted.[6]

## V. Infliction of Emotional Distress

In his Fourth, Fifth and Seventh Claims for Relief, Tischmann sets forth claims for intentional and negligent infliction of emotional distress.[7] Sheraton argues that these claims should be dismissed as an improper attempt to circumvent New York's at-will employment rule. In the alternative, Sheraton contends that both claims fail on the merits as a matter of law.

■ It is well-established that a plaintiff may not "subvert the traditional at-will contract rule by recasting his cause of action in terms of a tort of intentional infliction of emotional distress." *Murphy v. American Home Prods. Corp.,* 461 N.Y.S.2d at 236, 448 N.E.2d at 90. This rule is based on the principle that there is no cause of action for abusive or wrongful discharge of an at-will employee. *Id.; see also Cartelli v. Lanier Worldwide, Inc.,* 872 F.Supp. 1253, 1256 n. 2 (S.D.N.Y.1995) (noting that permitting an employment dispute to proceed under the guise of an intentional infliction of emotional distress claim would "mak[e] demotion (and even more so dismissal) an extremely high risk step for any employer to take"); *Ingle v. Glamore Motor Sales, Inc.,* 73 N.Y.2d 183, 538 N.Y.S.2d 771, 773–74, 535 N.E.2d 1311,

---

**6.** Similarly, in his Third Claim for Relief, Tischmann argues that he was wrongfully discharged in violation of Massachusetts public policy. As Massachusetts law does not apply, however, this claim must also be dismissed.

**7.** The Fifth and Seventh Claims for Relief essentially set forth the same claim based on negligent infliction of emotional distress.

1312–14 (1989) (stating that New York courts "decline[ ] to allow the use of substitute nomenclature or causes, such as prima facie tort or intentional infliction of emotional distress, to bootstrap the threshold deficiency in a wrongful discharge claim").

■ In light of these authorities, the Court finds that Tischmann's claims based on negligent and intentional infliction of emotional distress are not actionable under New York law, as both claims would circumvent New York's at-will employment rule. In fact, these claims merely rehash the same facts regarding Sheraton's decision to discharge Tischmann, characterizing the misconduct as separate tort claims. Accordingly, Sheraton's motion for summary judgment dismissing the Fourth, Fifth and Seventh Claims for Relief is granted.[8]

## VI. Severance Pay Claims

■ In Tischmann's Sixth and Eighth Claims for Relief, Tischmann asserts that Sheraton breached its promise to pay severance and pension benefits in the event of involuntary termination. Sheraton argues that, to the extent these claims seek redress for failure to provide payment pay pursuant to the Severance Plan, they are barred by the Employee Retirement Income Security Act of 1974 ("ERISA"). In opposition, Tischmann contends that these claims are not subject to ERISA preemption as the Severance Plan is not a "plan" within the meaning of the statute.

■ Congress enacted ERISA "to safeguard employees from the abuse and mismanagement of funds that had been accumulated to finance various types of employee benefits." *Massachusetts v. Morash*, 490 U.S. 107, 112, 109 S.Ct. 1668, 1671, 104 L.Ed.2d 98 (1989). ERISA § 1003(a) provides that ERISA shall apply to "any employee benefit plan if it is established or maintained ... by any employer engaged in commerce or in any industry or activity affecting commerce." 29 U.S.C. § 1003(a). An "employee benefit plan" is defined as "an employee welfare benefit plan or an employ-

ee pension benefit plan or [both]." 29 U.S.C. § 1002(3). An "employee welfare benefit plan" in turn is defined as:

> [A]ny plan, fund, or program which has heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) [medical] benefits in the event of ... unemployment ..., or (B) any benefit described in section 302(c) of the Labor Management Relations Act [pertaining to severance benefits].

29 U.S.C. § 1002(1).

■ ERISA also contains a broad preemption provision, embodied in ERISA § 1144(a), which provides, in relevant part, that its regulatory provisions "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in [§ 1003(a) ]." 29 U.S.C. § 1144(a). Accordingly, "if an employer's program is an employee welfare benefit plan, ERISA preempts state laws that 'provide an alternative cause of action to employees to collect benefits protected by ERISA.'" *James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d 463, 465 (2d Cir.1993) ("*James*") (quoting *Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146 (2d Cir.), *cert. denied*, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989)).

■ In order for ERISA to preempt state law, however, the employer's policy must constitute a "plan" within the meaning of ERISA. *See Fort Halifax Packing Co. v. Coyne ("Fort Halifax")*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987); *James v. Fleet/Norstar Fin. Group, Inc.*, 992 F.2d at 467. In *Fort Halifax*, the Supreme Court held that ERISA did not preempt a Maine statute that required severance pay for certain workers when an employer decided to close a plant. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. at 5, 107 S.Ct. at 2214. The

---

**8.** As the Court finds that New York law does not permit the substitution of plaintiff's intentional and negligent infliction of emotional distress

claims in lieu of a wrongful discharge claim, the Court need not address the merits of those claims.

Court determined that the state law was not preempted "because the statute neither establishes, nor requires an employer to maintain, an employee welfare benefit 'plan' under [ERISA]." *Id.* at 6, 107 S.Ct. at 2215. The Second Circuit Court of Appeals, addressing this issue in *James,* similarly held that an employer's decision to provide a lump sum severance payment upon an employee's termination did not constitute an ERISA "plan" and thus did not preempt state law. *James v. Fleet/Norstar Fin. Group, Inc.,* 992 F.2d at 466. The Court reasoned that:

> a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control.

*Id.* (quoting *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 12, 107 S.Ct. 2211, 2217–18, 96 L.Ed.2d 1 (1987)); *see also Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254, 257 (8th Cir.1994) ("The pivotal inquiry is whether the plan requires the establishment of a separate, ongoing administrative scheme to administer the plan's benefits."); *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530, 1538 (3rd Cir.1992) (finding that a single disbursement to each employee did not constitute an ERISA "plan" as it did not require an ongoing administrative scheme).

*Fort Halifax* and *James* are controlling in the case at hand. Specifically, the Severance Plan does not require an ongoing administrative program to meet Sheraton's obligations to its covered employees. Rather, the Severance Plan envisions payments pursuant to a "regular payroll schedule," or, if Sheraton chooses, in a "discounted lump sum." *See* Severance Plan, annexed to Def.'s Exhibits as Exh. "16," at 1. Although the implementation of the Severance Plan entails certain numerical calculations, *see* Affidavit of David H. Rhael, sworn to on Oct. 12, 1994, at ¶ 6, it does not require the establishment of " 'a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursements of benefits,' the protection of which is the pur-

pose of ERISA preemption." *James v. Fleet/Norstar Fin. Group, Inc.,* 992 F.2d at 467 (quoting *Fort Halifax Packing Co. v. Coyne,* 482 U.S. at 9, 107 S.Ct. at 2216). Thus, the Court holds that the Severance Plan is not an "employee welfare benefit plan" within the meaning of ERISA. Accordingly, Sheraton's motion for summary judgment dismissing Tischmann's Sixth and Eighth Claims for Relief on preemption grounds is denied.

## VII. Denial of Wages

Tischmann's Ninth Cause of Action sets forth a claim pursuant to New York Labor Law § 190 *et seq.* In brief, Tischmann seeks attorneys' fees and liquidated damages based on the contention that Sheraton's refusal to pay him severance, an annual bonus under the Incentive Plan and other benefits constitutes a willful denial of wages in violation of New York law. Sheraton argues that it is entitled to summary judgment on this claim on the ground that Tischmann has failed to establish any substantive wage claim as a basis for the imposition of New York labor law remedies.

██ New York Labor Law Section 190(1) ("Section 190(1)") defines wages as:

> the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis. The term 'wages' also includes benefits or wage supplements as defined in section one hundred ninety-eight-c of this article.

N.Y.Lab.Law § 190(1) (McKinney 1993). New York Labor Law Section 198(1–a) ("Section 198(1–a)") provides:

> In any action instituted upon a wage claim by an employee ..., the court shall allow such employee reasonable attorney's fees and, upon a finding that the employer's failure to pay the wage required by this article was willful, an additional amount as liquidated damages equal to twenty-five percent of the total amount of the wages found to be due.

N.Y.Lab.Law § 198(1–a) (McKinney 1993). The statutory remedy of an award of attorney's fees and liquidated damages is "limited

to actions for wage claims founded on the substantive provisions of Labor Law article 6 [Labor Law §§ 190–99]." *Gottlieb v. Kenneth D. Laub & Co.*, 82 N.Y.2d 457, 605 N.Y.S.2d 213, 217, 626 N.E.2d 29, 33 (1993); *see also Parker v. Revlon, Inc.*, — A.D.2d ——, 621 N.Y.S.2d 306, 307 (1st Dep't 1995) (same).

■ According to Sheraton, Tischmann cannot recover under Section 198(1–a) because (1) the severance pay claim is preempted by ERISA; (2) incentive compensation does not fit within the definition of "wages;" and (3) the amended complaint fails to set forth any substantive claim based on New York Labor Law § 190 *et seq.* As the Court has determined that Tischmann's claim based on the denial of severance pay is not preempted by ERISA, *see supra* at 19–23, Sheraton's contention with respect to this portion of the claim is denied.[9]

■ With respect to the bonus claim, however, the Court finds that the 1991 unpaid bonus does not constitute "wages" within the meaning of Section 190(1–a). Under New York law, incentive compensation based on factors falling outside the scope of the employee's actual work is precluded from statutory coverage. *See, e.g., Samuels v. Thomas Crimmins Contracting Co.*, No. 91 Civ. 6657, 1993 WL 36168, at *7 (S.D.N.Y. Feb. 9, 1993) (finding a promised bonus to be incentive compensation not covered by Section 190(1) as it was not based on the employee's individual performance); *Dean Witter Reynolds, Inc. v. Ross*, 75 A.D.2d 373, 429 N.Y.S.2d 653, 658 (1st Dep't 1980) (holding that an incentive plan tying an employee's bonus to the overall output rate of the department falls outside the purview of Section 190(1)); *but see Westheim v. Elkay Indus., Inc.*, 166 A.D.2d 318, 560 N.Y.S.2d 779, 780 (1st Dep't 1990) (upholding determination that a *nondiscretionary* bonus plan created by employer guaranteed "wages" under Section 190(1)).

Tischmann mistakenly relies upon *Giuntoli v. Garvin Guybutler Corp.*, 726 F.Supp. 494, 508–09 (S.D.N.Y.1989), in which this Court determined that a bonus payment constituted "wages" within the meaning of Section 190(1). In *Giuntoli*, unlike in the present case, however, the employee was guaranteed a bonus payment as a term of employment. *Id.* at 507. In the case at hand, it is undisputed that the Incentive Plan permits Sheraton to determine what amount, if any, should be paid to a participating employee in addition to the regular guaranteed salary.

Finally, although the amended complaint vaguely refers to "other benefits" and "business related expenses," it is unclear to which payments Tischmann refers. Thus, as this portion of the claim does not appear to set forth any substantive article 6 claim, it cannot form the basis for recovery under Section 198(1–a). Accordingly, Sheraton's motion for summary judgment with respect to Tischmann's Section 198(1–a) claim based on Sheraton's failure to pay (1) a 1991 bonus under the Incentive Plan; and (2) "other benefits" and "business related expenses" is granted.

## VIII. Defamation Claims

In his Tenth Claim for Relief, Tischmann alleges that several Sheraton employees, acting in the scope of their employment, defamed him by disclosing the false sexual harassment allegations to other Sheraton employees and certain unnamed individuals. Specifically, although not detailed in the amended complaint, it appears that Tischmann's claim is based on alleged statements by (1) Cannon to her boyfriend; (2) Sheraton to *Crain's*; (3) Sheraton to the *New York Observer*; (4) Power to a St. Regis union representative; (5) Palmer to Flanders; and (6) Madda to unnamed St. Regis employees.[10]

■ In order to establish a *prima facie* case of slander, a plaintiff must prove (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the

---

**9.** Severance pay clearly falls within the broad definition of "wages." *See, e.g., Metchick v. Bidermann Indus. Corp.*, No. 91 Civ. 2329, 1993 WL 106139, 1993 U.S.Dist. LEXIS 4278, at **14–15 (S.D.N.Y. April 7, 1993).

**10.** Tischmann's reference to these six alleged statements appears in his Opposition Memorandum of Law.

plaintiff. *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 61 (2d Cir.1993). Sheraton argues that it is entitled to summary judgment with respect to all six alleged statements on the ground that none of the allegedly defamatory statements were published.

With respect to the first alleged statement, even if Cannon had informed her boyfriend about Sheraton's sexual harassment investigation of Tischmann, this statement is not actionable against Sheraton because it was not made within the scope of her employment. *See H & H Int'l Corp. v. J. Pellechia Trucking, Inc.,* 119 F.R.D. 352, 353 (S.D.N.Y.1988) (stating that employers are only liable for the torts of employees committed within the scope of their employment).

As for the second and third allegedly slanderous statements, namely Sheraton's statements to *Crain's* and the *New York Observer,* the Court finds that there was no slander as a matter of law. A review of the *Crain's* article indicates that Sheraton refused any comment regarding Tischmann's termination. With respect to the *New York Observer* inquiry, it appears that Tischmann's claim is based on Sheraton's failure to deny that Tischmann had been terminated on sexual harassment grounds. Tischmann cites to no authority, however, for the proposition that Sheraton has an affirmative obligation to lie rather than refuse to confirm or deny the statements of a third party.

With respect to the remaining three alleged statements, the Court finds that Tischmann has failed to come forward with any evidence that any such statements were made. Tischmann's failure to present evidence in support of his position is fatal to his claim. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. at 2510–11 (stating that summary judgment should be granted where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative). Accordingly, Sheraton's motion for summary judgment dismissing the Tenth Claim for Relief is granted.

As for Tischmann's Eleventh Claim for Relief, setting forth a claim based on a theory of "compelled self-publication defamation," the Court finds that New York law does not recognize this cause of action. *See Wieder v. Chemical Bank,* 202 A.D.2d 168, 608 N.Y.S.2d 195, 196 (1st Dep't 1994). Accordingly, Sheraton's motion with respect to the Eleventh Claim for Relief is granted.

### CONCLUSION

For the reasons set forth above, Sheraton's motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing Tischmann's First, Second, Third, Fourth, Fifth, Seventh, Tenth and Eleventh Claims for Relief is granted. Sheraton's motion with respect to Tischmann's Sixth and Eighth Claims for Relief is denied. Sheraton's motion with respect to the Ninth Claim for Relief is granted except to the extent it is predicated on Sheraton's refusal to pay severance pursuant to the Severance Plan. The parties are directed to submit a joint pre-trial order by June 14, 1995 and appear at a pre-trial conference on June 21, 1995 at 2:00 p.m.

SO ORDERED.