**Carolann LACOPARRA, Plaintiff,**

v.

**PERGAMENT HOME CENTERS, INC., Defendant.**

No. 95 Civ. 8568(WCC).

United States District Court, S.D. New York.

Oct. 10, 1997.

Law Offices of Todd J. Krouner, Chappaqua, NY (Todd J. Krouner, Elizabeth R. Michel, of counsel), for Plaintiff.

Jackson, Lewis, Schnitzler & Krupman, Woodbury, NY (Paul J. Siegel, of counsel) and Pergament Home Centers, Inc. Executive Offices/General Counsel, Melville, NY (Marc S. Wenger, of counsel), for Defendant.

### *OPINION AND ORDER*

WILLIAM C. CONNER, Senior District Judge:

Plaintiff Carolann Lacoparra brings this action against Pergament Home Centers, Inc. ("Pergament"), her former employer, alleging that Pergament wrongfully terminated her in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended by the Pregnancy Discrimination

Act ("PDA"), 42 U.S.C. § 2000e(k); the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*;[1] and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296. In addition, Lacoparra seeks sanctions under Section 502(c) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(c), and recovery under state law for intentional infliction of emotional distress.[2]

Pergament moves for summary judgment on all claims; Lacoparra cross-moves for summary judgment on her ERISA claim. Having considered both motions, we grant summary judgment in favor of Pergament with respect to all claims and accordingly deny Lacoparra's cross-motion.

### Background

Carolann Lacoparra was hired in October 1992 as a full-time hourly associate in Pergament's Peekskill store. Lacoparra elected to participate in Pergament's health and life insurance plans.

At the end of March 1993, Lacoparra commenced a maternity leave. At the time, Pergament had an unwritten policy permitting employees an unpaid twelve-week leave of absence for medical reasons. Toward the end of August 1993, after an absence of approximately five months, Lacoparra returned to work at the Peekskill store in substantially the same position.

On April 15, 1994, Lacoparra began another maternity leave. The leave was necessitated by complications Lacoparra was having with her pregnancy. At the time of this second leave, Pergament had adopted an unpaid leave policy pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), which was enacted around the time Lacoparra returned from her first maternity leave. Pergament's FMLA policy was substantially the same as its pre-FMLA policy: twelve weeks of unpaid leave per year.

After she began the second maternity leave, six months passed without any contact between Lacoparra and Pergament. Lacoparra, despite shopping at the Peekskill store several times during those six months, made no attempt to notify Pergament about when or whether she intended to return to work. At the same time, even after the twelve-week period had expired and despite continuing to pay Lacoparra's portion of her medical insurance premiums, Pergament never contacted Lacoparra to inquire about her progress or intended return date.

On or about October 13, 1994, Pergament terminated Lacoparra. It did not notify her of her discharge.

### Discussion

I. *Summary Judgment Standard*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the non-moving party. *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 45 (2d Cir.1988).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Upon the movant's sat-

---

**1.** Lacoparra's original complaint, dated October 6, 1995, did not contain an ADA claim.

**2.** In her Amended Complaint, Lacoparra also asserted a claim for negligent infliction of emotional distress (Eighth Cause of Action) and, after seeking and receiving leave to amend her original complaint, a claim under Section 510 of the

Employee Retirement Income Security Act, 29 U.S.C. § 1140 (Fourth Cause of Action). She has withdrawn these claims. (*See* Pl. Memorandum of Law in Opposition to Def. Motion for Summary Judgment and in Support of Pl. Cross-Motion for Partial Summary Judgment ("Pl. Mem."), at 26, 31 n. 10.)

isfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2510. At this stage, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990).

Summary judgment should be employed sparingly in employment discrimination cases where the employer's intent, motivation, or state of mind are at issue. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir.1994); *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988) (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). A plaintiff "must nevertheless offer 'concrete evidence from which a reasonable juror could return a verdict in [her] favor,' *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514 ..., and is not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind." *Dister*, 859 F.2d at 1114. Moreover, "the summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment—avoiding protracted, expensive, and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri*, 759 F.2d at 998; *cf. McLee v. Chrysler Corp.*, 38 F.3d 67 (2d Cir.1994) (issuing writ of mandamus where district judge, under the impression that the Second Circuit had precluded grants of summary judgment in employment discrimination cases, declined to consider whether summary judgment was appropriate). This is particularly true where, as here, full discovery has taken place. *Dister*, 859 F.2d at 1114.

## II. *Family and Medical Leave Act*

In her First Cause of Action, Lacoparra claims that her termination was in violation of the Family and Medical Leave Act of 1993 ("FMLA").

The FMLA was enacted to balance the demands of the workplace with the needs of families by enabling workers to take reasonable leave to care for children and sick family members. *See* 29 U.S.C. § 2601(b). The FMLA entitles eligible employees to take up to twelve weeks of unpaid leave in a twelve-month period because of, *inter alia*, the birth of a child or a serious health condition that makes the employee unable to perform the functions of her job. *Id.* § 2612(a). Following such a leave, the employee is entitled to reinstatement to her former position or an equivalent one. *Id.* § 2614(a). The FMLA prohibits employers from interfering with, restraining, or denying the exercise of any right provided by the statute. *Id.* § 2615(a)(1).

The parties disagree as to whether Lacoparra was ever eligible for FMLA benefits. The FMLA defines an "eligible employee" as one who has been employed (1) for at least twelve months by the current employer, and (2) for at least 1250 hours of service with that employer during the previous twelve-month period. *Id.* § 2611(2)(A). To determine "hours of service," the FMLA instructs that the legal standards employed by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207, shall apply. *Id.* § 2611(2)(C). Under the FLSA, hours of service include only those hours that an employee actually works; time off for vacation, holiday, or illness is excluded. *Id.* § 207(e)(2).

According to Pergament's records, Lacoparra worked 1195.8 hours during the twelve-month period preceding her 1994 leave—54.2 hours short of qualifying for FMLA benefits. (*See* Def. Statement of Uncontested Facts Pursuant to Local Rule 3(g) in Support of its Motion for Summary Judgment ("Def. Rule 3(g) Statement") ¶ 21, and Exh. D annexed thereto.)[3] Lacoparra chal-

---

**3.** This calculation was made from a record of Lacoparra's hours generated by Pergament's payroll database. Pergament explains the procedure as follows:

lenges this total on four grounds. First, she contends that Pergament's record cannot be corroborated. (Pl. Mem. at 12.) In response to this argument, Pergament points out that Lacoparra is now seeking to discredit the time records upon which she was paid and to which she never previously objected. (Def. Memorandum of Law in Reply to Pl. Memorandum of Law in Opposition to Def. Motion for Summary Judgment and in Opposition to Pl. Cross–Motion for Partial Summary Judgment ("Def. Reply Mem."), at 5.) Regardless, Lacoparra's contention is of no moment unless she can put forth evidence of her own.[4]

■ Second, Lacoparra asserts that Pergament's calculation ignores her "off the clock" hours of service. (Pl. Mem. at 12.) However, she has provided no evidence of any such hours.

■ Third, Lacoparra argues that because she received Pergament's health and life insurance benefits at all relevant times, she must have worked at least 1250 hours. (Id. at 11.) She points out that in order to qualify for the company's benefits, an employee must be classified as a "full-time" employee. (See Luckwaldt Dep. at 76.) Lacoparra received health and life insurance benefits at all times during her employment with Pergament, and her employee profile form classified her as "full time." (Id. at 76–77.) Pergament's full-time employees are required to work at least 40 hours per week. (Id. at 75.) From this Lacoparra concludes that she must have worked at least 40 hours in each of the 36 weeks for which she received pay between April 1993 and April

1994—a total that would put her above the 1250 FMLA minimum. (See Pl. Mem. at 11.)

For several reasons, Lacoparra's classification as a full-time employee is not sufficiently probative of whether she actually worked 40–hour weeks. We need not explore these reasons, however, for Lacoparra has herself admitted that since returning from her first maternity leave in August 1993, she rarely worked 40 hours per week. (See Lacoparra Dep. at 107.) Her own testimony contradicts the inference that she urges and suggests that her argument is less than candid.

■ Finally, Lacoparra notes that in the FMLA log kept by Deborah Luckwaldt, Pergament's Manager of Benefits Administration, Luckwaldt wrote "OK" and signed her initials in the "Eligibility Checked" box. (See FMLA Log, Krouner Affirmation, Exh. D.) She argues that this constitutes an admission on the part of Pergament that she was eligible for FMLA benefits. (Pl. Mem. at 12.) We are not inclined to agree. Luckwaldt's testimony suggests that she never actually checked the number of hours Lacoparra had worked between April 1993 and April 1994, but rather just assumed that Lacoparra was eligible because she had been a Pergament employee for over twelve months in accordance with the FMLA and was listed as a full-time employee. (See Luckwaldt Dep. at 66, 135.) However, without deciding whether these competing contentions create a jury question, we note that even if we assume that Lacoparra did not work the requisite 1250 hours and thus does not fall under the FMLA's definition of an "eligible employee," she may nevertheless be

During the relevant time period, employee hours were recorded by the employees punching in their employee code numbers on a digital key pad at the stores. This information was electronically transmitted to a central computer file each evening. At the end of each week, the key punch data was converted to payroll data. This information was kept in this form for approximately 18 months, at which point it was stored on magnetic tape. The document [from which the calculation was made] was generated from the magnetic tape. (Def. Response to Request No. 3 of Pl. Fourth Request for Production of Documents, dated Dec. 2, 1996, attached to Reply Aff. of Deborah Luckwaldt in Support of Def. Motion for Summary Judgment.)

The record includes the hours Lacoparra worked from April 1993 to April 1994, and breaks them down into four categories: regular hours, overtime hours, sick leave hours, and holiday hours. Over that time period, Lacoparra logged 1225.2 regular hours, 18.6 overtime hours, eight sick leave hours, and 40 holiday hours. (See Def. Rule 3(g) Statement, Exh. D.) For purposes of the FMLA, then, Pergament's record reflects that Lacoparra performed 1195.8 hours of service (1225.2 + 18.6—8—40).

4. In her deposition, Lacoparra stated that she has no copies of her pay stubs or any other records of her hours of employment. (Lacoparra Dep. at 175–76.)

entitled to FMLA protection if Pergament wrongfully caused her ineligibility.

■ As noted above, the FMLA states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the statute or its regulations. 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(a), (b).[5] At least one court has indicated that the failure of an employer to provide an employee with the statutorily-required notice of its FMLA policies may interfere with the employee's exercise of her FMLA rights "by depriving [her] of the opportunity to choose to remain within the protection of the FMLA." *Fry v. First Fidelity Bancorp.*, No. 95–6019, 1996 WL 36910, at *4 (E.D.Pa. Jan.30, 1996). We agree that an employer's failure to provide adequate notice of FMLA procedures may constitute interference with an employee's FMLA rights if it causes the employee to forfeit FMLA protections. *See id.* at *5. Therefore, even if Lacoparra falls short of the 1250–hour eligibility minimum, she can overcome this infirmity if (1) the shortfall resulted from Pergament failing to provide adequate notice of her FMLA rights and obligations, and (2) the lack of information actually caused her to forfeit an FMLA entitlement.

■ Lacoparra alleges that Pergament provided insufficient notice of her rights and responsibilities under the FMLA. The FMLA requires that employers post conspicuous notices of pertinent FMLA requirements. 29 U.S.C. § 2619(a); *see also* 29 C.F.R. § 825.300(a) (1994). In addition, FMLA regulations promulgated by the United States Department of Labor provide that information concerning FMLA entitlements and obligations must be included in any written materials, such as an employee hand-

book, advising employees of the employer's benefits or leave policies. 29 C.F.R. § 825.301(a)(1). Whether or not such written materials are distributed, "when an employee provides notice of the need for FMLA leave, the employer shall provide the employee with notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." *Id.* § 825.301(c).[6]

Lacoparra claims that Pergament never notified her of the requirements of its FMLA policy and consequently deprived her of her "substantive right to reinstatement at the end of her pregnancy leave." (Pl. Mem. at 13.) Moreover, Lacoparra asserts that Pergament never notified her that she could be terminated if her maternity leave exceeded twelve weeks. (Letter from Todd Krouner to Donald Jacobson, dated Nov. 2, 1994, attached as Exh. C to Krouner Aff.) Pergament maintains that it fully informed Lacoparra of the FMLA eligibility requirements and procedures. Deborah Luckwaldt, Pergament's Manager of Benefits Administration, testified that Pergament distributed to each store a poster communicating employees' FMLA rights, along with a memo directing store managers to make their employees aware of the information. (Luckwaldt Dep. at 19–20.) Scott Sottile, the manager of the Pergament store at which Lacoparra worked, testified that the FMLA information was posted by the employee time clock. (Sottile Dep. at 128.) In addition, Luckwaldt testified that around the time Lacoparra began her 1994 maternity leave, they had a telephone conversation during which Luckwaldt advised Lacoparra of the eligibility requirements (including the 1250–hour minimum), that during the conversation she told Lacoparra that she would mail relevant FMLA documents to Lacoparra's home address, and

---

5. The FMLA provides a private right of action for such violations. *See id.* § 2617(a).

6. For purposes of this motion, the applicable FMLA regulations are those that were in place in 1994, when the events leading to this action occurred. The interim regulations, which went into effect on August 5, 1993, were replaced by final regulations effective February 6, 1995. *See* 60 Fed.Reg. 2180, 2181 (Jan. 6, 1995). However, FMLA regulations cannot be applied retroac-

tively. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 471–72, 102 L.Ed.2d 493 (1988) (regulations, like statutes, will not be construed to apply retroactively absent express direction to do so); *Johnson v. Primerica*, No. 94–4869, 1996 WL 34148, at *7 n. 9 (S.D.N.Y. Jan.30, 1996) (FMLA regulations not applied retroactively). Therefore, the interim regulations govern the instant action.

that soon after the conversation she did in fact mail the FMLA papers to Lacoparra and recorded that she had done so in the FMLA log. (*See* Luckwaldt Dep. at 27, 44–50, 66.)

Lacoparra flatly denies receiving any notice from Pergament—via mail, poster, or otherwise—of her rights and obligations under the FMLA prior to her termination in October 1994. (Pl. Statement of Material Facts Pursuant to Local Rule 3(g) in Opposition to Defendant's Motion for Summary Judgment ("Pl. Rule 3(g) Statement") ¶ 5; Pl. Mem. at 4.) She maintains that if she had known about the 1250–hour requirement, she could and would have worked the extra hours needed to qualify for FMLA protection. (Pl. Mem. at 5.) Arguably, then, Lacoparra's blanket denial is sufficient for summary judgment purposes to establish that her ineligibility was caused by Pergament's insufficient notice of her FMLA obligations.

Curiously, however, Lacoparra is unable to demonstrate that this matters. She claims that Pergament denied her the two primary perquisites of FMLA protection: continuing insurance benefits and reinstatement. (*See* Am. Compl. ¶ 8; Pl. Mem. at 13.) Yet her own testimony is to the contrary.

To begin with, Lacoparra provides no evidence that Pergament failed to fulfill its statutory obligation to maintain her health benefits while she was on leave. *See* 29 U.S.C. § 2614(c)(1); 29 C.F.R. § 825.209. On the contrary, Lacoparra does not deny that Pergament not only maintained her health coverage while she was on leave, but also paid her share of the premiums for those six months. (*See* Def. Rule 3(g) Statement ¶ 31.) Pergament was under no obligation to do this; indeed, FMLA regulations require employees to pay their share of premium payments while on leave. 29 C.F.R. § 825.210; *see also id.* § 825.212. It appears that Lacoparra made no payments. (*See* Luckwaldt Dep. at 144.) [7] Moreover, upon terminating Lacoparra, Pergament provided Lacoparra with

the forms she needed to obtain continued health care coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA").[8] (*See* Lacoparra Dep. at 160–62; Def. Rule 3(g) Statement ¶ 39.) Lacoparra applied for and received COBRA coverage. (*See* Lacoparra Dep. at 157.) As a result of the health insurance Pergament maintained while she was on leave and the COBRA coverage she received after her termination, all of Lacoparra's leave-related medical bills were paid in full by Pergament's health insurance carrier. (Lacoparra Dep. at 32; Def. Rule 3(g) Statement ¶ 40.) Consequently, Lacoparra has received all of the health care benefits to which the FMLA entitled her, even without paying her share of the premiums.

Nor did Pergament deny her the FMLA's employment protection. In her motion papers, Lacoparra states that shortly after her termination, she requested but was denied reinstatement. (*See* Pl. Rule 3(g) Statement ¶ 10; Pl Mem. at 14, 16–17.) This assertion is entirely disinguous. Lacoparra—or rather her attorney, Todd J. Krouner—bases this "statement of fact" on an October 20, 1994 letter sent by Krouner to Donald Jacobson, Pergament's general counsel. (*See* Letter, dated Oct. 20, 1994, attached as Exh. A to Wenger Aff.) In this letter, written about one week after Lacoparra's termination, Krouner demanded her reinstatement. Jacobson responded by stating that "[w]hen and if [Lacoparra] is able to return to work, she may reapply for a position." (Letter, dated Oct. 26, 1994, attached as Exh. B to Wenger Aff.) Krouner followed with a letter informing Jacobson, *inter alia*, that Lacoparra would file a complaint with the Equal Employment Opportunity Commission. (*See* Letter, dated Nov. 2, 1994, attached as Exh. C to Wenger Aff.) Jacobson once again responded by indicating that "[w]hen and if your client is able and desires to return to work, you may contact me if she is unaware

---

7. Although Pergament seems to have provided health coverage in excess of the FMLA requirements, this generosity appears not to have been the product of benevolence, but of administrative oversight. (*See* Luckwaldt Dep. at 144.)

8. The Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161, *et seq.*, requires sponsors of group health care plans to provide continuation coverage for terminated employees under certain circumstances. *Local 217, Hotel & Restaurant Employees Union v. MHM, Inc.*, 976 F.2d 805, 806–07 (2d Cir.1992).

of the procedure for possible reinstatement." (Letter, dated Nov. 15, 1994, attached as Exh. D to Wenger Aff.)

Subsequently, although Lacoparra knew about Pergament's offer, she never contacted Pergament about reinstatement (either before or after she was physically able to return to work in January 1995). (*See* Lacoparra Dep. at 129–32.) Lacoparra cannot now complain that Pergament never reinstated her when she ignored Pergament's suggestions that she apply for reinstatement.

Therefore, we find that even if Lacoparra qualified for FMLA protection or, alternatively, even if Pergament caused her ineligibility by failing to properly notify her of FMLA requirements, Lacoparra's own evidence contradicts her assertion that Pergament denied her benefits to which the FMLA would have entitled her. Accordingly, we grant Pergament's motion for summary judgment with respect to Lacoparra's FMLA claim.

III. *Title VII and the Pregnancy Discrimination Act*

As a Second Cause of Action, Lacoparra claims that Pergament terminated her in violation of Title VII and the Pregnancy Discrimination Act.

Title VII of the Civil Rights Act of 1964 provides, *inter alia*, that it is unlawful for "an employer to ... discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e–2(a)(1). The Pregnancy Discrimination Act of 1978 ("PDA"), codified at 42 U.S.C. § 2000e(k), is a definitional amendment to Title VII enacted to include pregnancy-based discrimination in Title VII's prohibition of gender-based employment discrimination.[9] *McNill v. New York City Dep't of Correction,* 950 F.Supp. 564, 569 (S.D.N.Y.1996).

In determining a motion for summary judgment in a Title VII case, the district court's analysis must track the burden-shifting scheme that guides the trial of such cases. Under this scheme, the plaintiff bears the initial burden of establishing a prima facie case of employment discrimination by showing by a preponderance of the evidence that: (1) she is a member of a protected class; (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) the discharge occurred under circumstances giving rise to an inference of unlawful discrimination. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 & n. 13, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995).[10] Establishment of a prima facie case creates an initial presumption of unlawful discrimination. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

The burden of establishing a prima facie case "is not onerous." *Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir.1997) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94). However, the fact that a plaintiff has satisfied these minimal prima facie elements "is no indication that, at the end of the case, plaintiff will have enough evidence of discrimination to support a verdict" in her favor. *Id.* at 1337.[11] Rather, the prima facie

---

**9.** The PDA provides, in relevant part:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work...."

42 U.S.C. § 2000e(k).

**10.** The elements of the prima facie case may vary according to the facts relevant to the specific claim of discrimination. *See McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *Montana v. First Fed. Sav., & Loan Ass'n,* 869 F.2d 100, 104 (1989).

Additionally, the burden-shifting framework does not alter the fact that the plaintiff at all times bears the ultimate burden of persuading the trier of fact that the defendant unlawfully discriminated against her. *See Quaratino,* 71 F.3d at 64.

**11.** *See also id.* at 1337 ("discrimination cases

case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Levin v. Analysis & Tech., Inc.,* 960 F.2d 314, 316 (2d Cir.1992) (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094). In essence, the presumption temporarily excuses the plaintiff from having to show that discrimination actually existed and caused the termination. *Fisher,* 114 F.3d at 1337.

If the plaintiff does demonstrate a prima facie case and a presumption of unlawful discrimination thereby arises, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for terminating the plaintiff. Any such reason will suffice; the employer " 'need not persuade the court that it was actually motivated by the proffered reasons' in order to nullify the presumption and obligate the plaintiff to satisfy the burden of proof." *Id.* at 1335–36 (quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094).

If the employer satisfies this burden of production, the presumption of discrimination "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993) (citing *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094). At this stage, a plaintiff may prevail only if she shows by a preponderance of the evidence that the employer's proffered explanation is a pretext for discrimination, "either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction— or both." *Fisher,* 114 F.3d at 1339; *see also Hicks,* 509 U.S. at 515–16, 113 S.Ct. at 2751– 52 (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94). A plaintiff does not win merely by proving the asserted reason to be false; rather, an employer's proffered reason must be false and its real reason must be unlawful discrimination. *Hicks,* 509 U.S. at 515–16, 113 S.Ct. at 2751–52; *Fisher,* 114 F.3d at 1338–39; *Quaratino,* 71 F.3d at 64. In other words, with the presumption no longer oper-

ating, "[t]he question becomes the same question asked in any other civil case: Has the plaintiff shown, by a preponderance of the evidence, that the defendant is liable for the alleged conduct?" *Fisher,* 114 F.3d at 1336.

■ Turning to the instant action, we will assume for present purposes that Lacoparra can establish a prima facie case of discrimination for summary judgment purposes. *Cf. Owens v. Waldorf–Astoria Corp.,* No. 92– 4561, 1997 WL 251556, at *3 (S.D.N.Y. May 13, 1997) (assuming *arguendo* that plaintiff could establish prima facie case); *Santiago v. Greyhound Lines, Inc.,* 956 F.Supp. 144, 155 (N.D.N.Y.1997) (same). Nonetheless, the reason for the termination proffered by Pergament suffices to rebut the prima facie presumption. Pergament maintains that Lacoparra was discharged because she had more than exhausted the twelve weeks of maternity leave that Pergament, pursuant to the FMLA, allowed to its employees. (Def. Rule 3(g) Statement ¶¶ 33–36; Def. Mem. at 14.) This explanation constitutes a legitimate, non-discriminatory rationale for Lacoparra's termination.

■ Accordingly, the prima facie presumption of discrimination is dispelled and the burden shifts back to Lacoparra to offer evidence sufficient to require a jury to decide whether Pergament's proffered justification is in fact a pretext for discrimination. Lacoparra must provide proof not only that Pergament's explanation is false, but also that unlawful discrimination was its true motivation in terminating her. *See Hicks,* 509 U.S. at 515–16, 113 S.Ct. at 2751–52; *Fisher,* 114 F.3d at 1338–39. Lacoparra can do neither.

■ In support of its motion for summary judgment, Pergament provides the following description of the circumstances surrounding Lacoparra's termination. Until the spring of 1994, Pergament's payroll department was responsible for monitoring leaves of absence. The payroll department would

differ from many areas of law in that under the *McDonnell Douglas* burden-shifting framework a plaintiff's satisfaction of the minimal requirements of the prima facie case does not necessarily mean, even if the elements of the prima facie

case go unchallenged, that plaintiff will ultimately have sufficient evidence to support a verdict on each element that plaintiff ultimately must prove to win the case").

audit employee time cards and would initiate the termination of any employee found to have exceeded the twelve-week maximum. At some point in the spring of 1994—around the time Lacoparra began her maternity leave—Pergament transferred the responsibility of monitoring leave periods and initiating terminations from the payroll department to the store managers. (Luckwaldt Dep. at 10–11, 59, 64.) However, this change seems not to have been communicated to the store managers. (*See id.* at 10–11, 64; Sottile Dep. at 140.)

Apparently, then, during the six months that Lacoparra was on leave, neither the payroll department nor Lacoparra's manager, Scott Sottile, was monitoring Pergament employees' disability leaves. (*See* Luckwaldt Dep. at 11.) Lacoparra's six-month absence seems to have escaped Pergament's notice until mid-October, when (after Lacoparra had gone shopping at the Peekskill store) murmurs about Lacoparra's prolonged leave and continuing benefits reached Sottile's ears. (*See* Sottile Dep. at 141–42.) After receiving this information through the "grapevine," Sottile contacted Deborah Luckwaldt, the Manager of Benefits Administration, and asked her what the procedure was for employees out on medical leave. (*Id.;* Luckwaldt Dep. at 12.) Luckwaldt informed Sottile of the twelve-week maximum. When Sottile told her that he was asking in reference to Lacoparra, Luckwaldt retrieved Lacoparra's employee file from the mainframe and discovered that she had been out since April. Luckwaldt then informed Sottile that, pursuant to the new monitoring procedure, it was his responsibility to initiate Lacoparra's termination. (Luckwaldt Dep. at 12.) After a series of e-mails between Sottile and Luckwaldt confirming Lacoparra's extended absence and consequent termination, on October 13 Luckwaldt directed the payroll department to terminate Lacoparra. (*See id.* at 97–98; Sottile Dep. at 137–39.)

Lacoparra's evidence is wholly insufficient to support her contention that Pergament's explanation is false and that her termination was motivated by unlawful discrimination.

Her discrimination theory unfolds into three parts. First, Lacoparra asserts that Pergament applied its leave policy against her in a discriminatory fashion.[12] In essence, she claims that because (1) in 1993 (when Pergament's unwritten, pre-FMLA policy was in force) she was able to take a five-month maternity leave and return to work, and (2) store manager Sottile testified that the leave policy in effect in 1993 was no different than its 1994 policy, then (3) Pergament's decision in October 1994 (when the FMLA policy had been implemented) to terminate her in the midst of a six-month (and counting) maternity leave must have been motivated by pregnancy discrimination. (*See* Pl. Mem. at 7–8, 17–19.)

Second, Lacoparra contends that the timing of her termination indicates that she was discharged because of her pregnancy. Because Pergament could have terminated her in July 1994 (twelve weeks after her leave began), its choice not to terminate her until October 1994 (when she was in her third trimester) demonstrates that the "imminent birth of her child" was the "catalyst" for her termination. (Pl. Mem. at 8.) Third, Lacoparra maintains that Pergament's failure to notify her of her termination is "[e]qually troubling." (*Id.*) Apparently, Lacoparra infers from Pergament's silence then that it is lying now.

With respect to these first three points, we find that Lacoparra's inferential leaps prove neither that Pergament's explanation is pretextual nor that its real motivation was pregnancy discrimination. At best, the facts present the story of an employer who devoted little attention to monitoring its employees' medical leaves; who allowed an employee to return to work after a five-month maternity leave with, apparently, no questions asked; who, after permitting that same employee to take another maternity leave the following year, seems to have forgotten about her until, by chance, it realized that she had been gone for twice the allotted leave time; and who then fired her. At the same time, we have an employee who claims to have received no notice of the

---

**12.** Lacoparra concedes that on its face and as applied to other employees, Pergament's leave policy did not discriminate on the basis of gender or pregnancy. (*See* Lacoparra Dep. at 217.)

maximum twelve-week leave (despite her employer's insistence that it provided this information through a variety of channels); who leaves work and remains incommunicado for an indefinite period; who fully expects her employer to maintain her benefits and position indefinitely; and who is shocked to discover that, after six months off the job without once speaking to her employer, she has been deemed to have abandoned her job. Although inattention and errors of judgment appear to have plagued both parties, we detect no subplot of discrimination.

■ Fourth, and finally, "at the heart of [Lacoparra's] PDA claim" are four comments allegedly made by Sottile as evidence that her termination was motivated by unlawful discrimination. (Pl. Mem. at 2.) After Lacoparra had returned from her 1993 maternity leave, Sottile allegedly told her that she "worked better before [she] left." (Lacoparra Dep. at 101.) Lacoparra also testified that Sottile told her that she "cost [Pergament] money." (*Id.* at 83.) In addition, upon learning that Lacoparra was taking another leave for pregnancy complications, Sottile allegedly said, "Here we go again." (*Id.* at 88.) Finally, one day while Lacoparra was up on a ladder, Sottile allegedly commented, "this is a nice view." (*Id.* at 101.)

■ We find that Sottile's purportedly discriminatory remarks are far too ambiguous and insubstantial to support the "heart" of a Title VII discrimination claim. Random remarks in the workplace, without a demonstrated nexus to an employee's termination, are insufficient to create a material issue of fact to defeat an employer's motion for summary judgment. *See Bellom v. Neiman Marcus Group, Inc.*, 975 F.Supp. 527, 1997 WL 535234, at *4 (S.D.N.Y.1997); *Bern v. United Mercantile Agencies*, 942 F.Supp. 217, 220 (S.D.N.Y.1996) (citing *O'Connor v. Viacom, Inc.*, No. 93–2399, 1996 WL 194299, at *5 (S.D.N.Y.) (collecting cases), *aff'd*, 104 F.3d 356 (2d Cir.1996)). The comments attributed to Sottile are ambiguous and temporally removed from the termination, and shed no light on whether the actual decision to discharge Lacoparra was motivated by any kind of discriminatory intent.

In sum, Lacoparra has presented no evidence of pregnancy discrimination that would transform her speculation into a triable issue of fact. Accordingly, we grant Pergament's motion for summary judgment with respect to the Title VII and PDA claims.

#### IV. *New York State Human Rights Law*

■ Lacoparra brings a parallel state claim of gender and pregnancy discrimination under the New York State Human Rights Law ("NYSHRL") (her Sixth Cause of Action). Although we are dismissing Lacoparra's federal claims, we exercise our discretion under 28 U.S.C. § 1367(c) to retain supplemental jurisdiction over her NYSHRL claim based on judicial economy and the close relationship between her federal and state claims. *See Aquinas v. Federal Express Corp.*, 940 F.Supp. 73, 79 (S.D.N.Y. 1996); *Sweet v. Electronic Data Sys., Inc.*, No. 95–3987, 1996 WL 204471, at *3 (S.D.N.Y. Apr. 26, 1996).

■ The NYSHRL provides, *inter alia,* that it shall be an unlawful discriminatory practice for an employer to discharge or otherwise discriminate against any employee because of her gender or disability. N.Y. Exec. Law § 296(1)(a) (McKinney Supp. 1997). The elements of an employment discrimination claim are virtually identical under the NYSHRL and Title VII. *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 479, 102 S.Ct. 1883, 1896, 72 L.Ed.2d 262 (1982); *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714–15 (2d Cir.1996) (citing *Miller Brewing Co. v. State Div. of Human Rights*, 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985)).

Therefore, because our Title VII analysis dictates our determination of the pendent NYSHRL claim, we grant Pergament's motion for summary judgment with respect to the latter claim as well.

#### V. *Americans with Disabilities Act*

■ Lacoparra next claims that Pergament violated the Americans with Disabilities Act ("ADA") by discharging her because she suffered from a disability (her Third Cause of Action). As an initial matter, Pergament

asserts that this Court does not have jurisdiction over the ADA claim because the complaint Lacoparra filed with the Equal Employment Opportunity Commission ("EEOC") failed to allege disability discrimination. Filing a timely charge with the EEOC, although not a jurisdictional prerequisite,[13] is a statutory condition precedent to commencing a federal court action under the ADA. *See* 42 U.S.C. §§ 2000e–5(e), 12117(a); *Lillien v. M.A.B.S.T.O.A. (MTA)*, No. 95–10009, 1996 WL 711495, at *2 (S.D.N.Y. Dec.11, 1996); *Sank v. City Univ. of New York*, No. 94–0253, 1995 WL 314696, at *3 (S.D.N.Y. May 24, 1995); *see also Butts v. City of New York Dep't of Housing Preservation and Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) (Title VII).

█ However, a federal court may entertain a claim not alleged in an EEOC charge if it is "reasonably related" to the allegations in the EEOC charge. *Butts*, 990 F.2d at 1402. A claim is "reasonably related" where, *inter alia*, "the conduct complained of would fall within the 'scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Id.* (quoting *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 107 n. 2 (2d Cir. 1978)). The proper focus of this inquiry lies in the factual allegations of the EEOC charge. *Williams v. Borough of Manhattan Community College*, No. 94–4304, 1996 WL 457322, at *8 (S.D.N.Y. Aug. 14, 1996), *aff'd*, 113 F.3d 1230 (2d Cir.1997); *Bridges v. Eastman Kodak Co.*, 822 F.Supp. 1020, 1026 (S.D.N.Y.1993).

In the instant action, Lacoparra filed a complaint with the EEOC on July 18, 1995. (EEOC Complaint, attached as Exh. D to Def. Rule 3(g) Statement.) On the front of the EEOC complaint form, Lacoparra checked the "cause of discrimination" boxes for "sex" and "other"; next to the "other" box she typed in "pregnancy." In an attached factual statement, Lacoparra charged that she "was terminated by Pergament ... while on disability leave for a problem pregnancy.... Such termination by Pergament constitutes a discriminatory act under Title VII [as amended by the Pregnancy Discrimination Act]." Pergament maintains that a disability claim is not reasonably related to the pregnancy and gender discrimination claims set forth in the EEOC charge. Pergament points out that Lacoparra specifically described her charge as a Title VII/PDA claim and typed in "pregnancy," rather than "disability," next to the "other" box. Pergament also notes that Lacoparra never intended to pursue a disability discrimination claim because she raised it in neither her EEOC complaint nor the original complaint in this action. Additionally, Pergament argues that the pregnancy/gender claims are not reasonably related to the disability claim because they are distinct legal theories. (*See* Def. Mem. at 20–21.) Lacoparra responds merely by asserting that "it is hard to imagine any two claims being more 'reasonably related' than" the pregnancy and pregnancy-related disability claims. (Pl. Mem. at 20.)

We find this issue to be a very close call. For present purposes, however, we will assume *arguendo* that the pregnancy and disability claims are reasonably related and thus that Lacoparra's ADA claim is properly before us.

We turn now to the substance of the ADA claim. The ADA prohibits covered employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to,"

---

13. Technically, the exhaustion requirement is not jurisdictional, but rather has been treated like a statute of limitations. *See Zipes v. Trans. World Airlines*, 455 U.S. 385, 392–98, 102 S.Ct. 1127, 1131–35, 71 L.Ed.2d 234 (1982); *Williams v. Borough of Manhattan Community College*, No. 94–4304, 1996 WL 457322, at *3 (S.D.N.Y. Aug. 14, 1996); *Walsh v. National Westminster Bancorp.*, 921 F.Supp. 168, 171 (S.D.N.Y.1995).

The purpose of this statutory prerequisite is "to encourage settlement of discrimination disputes through conciliation and voluntary compliance." *Butts v. City of New York Dep't of Housing Preservation and Dev.*, 990 F.2d 1397, 1401–02 (2d Cir.1993); *see also Stewart v. United States Immigration and Naturalization Serv.*, 762 F.2d 193, 198 (2d Cir.1985) ("the purpose of the exhaustion requirement ... is to give the administrative

*inter alia,* discharge from employment.[14] 42 U.S.C. § 12112(a). In order to survive an employer's motion for summary judgment, a plaintiff must establish a prima facie case of discrimination under the ADA by producing evidence sufficient to support a reasonable inference of discrimination. *Johnson v. New York Medical College,* No. 95–8413, 1997 WL 580708, at *4 (Sept. 18, 1997).[15] In order to establish a prima facie case under the ADA, a plaintiff must show that: (1) she is "disabled" within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she was discharged because of her disability. *Christopher v. Laidlaw Transit Inc.,* 899 F.Supp. 1224, 1226–27 (S.D.N.Y., 1995); *see also Wernick v. Federal Reserve Bank,* 91 F.3d 379, 383 (2d Cir.1996); *Aquinas v. Federal Express Corp.,* 940 F.Supp. 73, 77 (S.D.N.Y. 1996).

Here, the record does not support the conclusion that Lacoparra was "disabled" within the meaning of the ADA. The ADA defines "disability" as either "a physical or mental impairment that substantially limits one or more of the major life activities"; "a record of such an impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A–C).

With respect to the first prong of the definition, courts consider (1) whether the plaintiff's condition is a physical or mental impairment; (2) whether that impairment affects a major life activity; and (3) whether the major life activity is substantially limited by the impairment. *Cerrato v. Durham,* 941 F.Supp. 388, 391–92 (S.D.N.Y.1996). According to the regulations promulgated by the EEOC, a "physical or mental impairment" is a physiological disorder or condition that affects one or more body systems. 29 C.F.R. § 1630.2(h)(1) (1996). The term "major life activities" includes, but is not limited to, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id.* § 1630.2(i). An individual is "substantially limited" by an impairment if she is "[s]ignificantly restricted as to the condition, manner, or duration under which [she] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." *Id.* § 1630.2(j)(1)(ii); *see also Aquinas,* 940 F.Supp. at 77 ("the ADA protects only a limited class of persons—individuals who suffer from impairments significantly more severe than those encountered by ordinary people in everyday life").

The regulations explicitly state that "conditions, such as pregnancy, that are not the result of a physiological disorder are not impairments" and thus do not qualify as "disabilities." *Id.* Pt. 1630, App. § 1630.2(h) at 338–39. That is not to say, however, that physiological complications arising from pregnancy, as distinguished from the condition of pregnancy itself, can never render a woman "disabled" under the ADA. In such situations, the question is whether the complication itself (*i.e.,* the "impairment," or physiological disorder) is substantial enough to qualify as a "disability," regardless of the fact that the woman is pregnant. *See* EEOC Compliance Manual, Vol. 2, EEOC Order 915.002, § 902, Definition of the Term "Disability" (issued Mar. 14, 1995) (attached as

---

agency the opportunity to investigate, mediate, and take remedial action").

**14.** The statute defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

**15.** The ADA follows the burden-shifting analysis of Title VII. Thus, if the plaintiff is able to establish a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision to terminate the plaintiff. If the employer is able to do so, the burden shifts back to the plaintiff to show that the employer's proffered reason is pretextual and that unlawful discrimination was the actual reason for the termination. *Kolivas v. Credit Agricole,* No. 95–5662, 1996 WL 684167, at *3 (S.D.N.Y. Nov.26, 1996) (citing *Heilweil v. Mount Sinai Hosp.,* 32 F.3d 718, 722 (2d Cir.1994) (Rehabilitation Act)), *aff'd,* 125 F.3d 844, 1997 WL 606742 (2d Cir.1997).

Exh. B to Pl Mem.).[16]

That said, pregnancy-related complications usually will not qualify a woman for ADA protection. Significantly, the interpretive guidance accompanying the ADA regulations states that "temporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities." 29 C.F.R. Pt. 1630, App. § 1630.2(j) at 339. Based largely on this guideline, courts have concluded that "pregnancy and related medical conditions do not, absent unusual circumstances, constitute a [disability] under the ADA."[17] *Villarreal v. J.E. Merit Constructors, Inc.*, 895 F.Supp. 149, 152 (S.D.Tex.1995); *Tsetseranos v. Tech Prototype, Inc.*, 893 F.Supp. 109, 119 (D.N.H. 1995); *see also Gudenkauf v. Stauffer Communications, Inc.*, 922 F.Supp. 465, 474 (D.Kan.1996) (in order to qualify for ADA protection, pregnancy must be "unusual or abnormal" and complications must be "outside the normal range"). The severity, duration, and impact of pregnancy-related medical conditions are issues to be determined on a case-by-case basis. *See* 29 C.F.R. Pt. 1630, App. § 1630.2(j) at 339.

In the instant case, Lacoparra has offered insufficient evidence that she was "disabled" under the ADA. The record supports Lacoparra's claim that she suffered from a history of infertility, a prior miscarriage, and spotting and cramping during the 1994 pregnancy. There is no evidence, however, that any of these conditions were chronic or resulted in long-term or permanent impact. *Cf.* 29 C.F.R. Pt. 1630, App. § 1630.2(j) at 339. On the contrary, her evidence suggests that, if anything, the existence and impact of the complications were temporary. Her deposition testimony and medical forms indicate that the spotting occurred in the first trimester only, (*see* Letter from Laurie Grant, M.D., dated July 28, 1994 ("Grant Letter"), attached as Exh. I to Krouner Aff.); that the bed rest prescribed by her doctor (as a result of cramping) was temporary, (*see* Lacoparra Dep. at 134, 181; Note of Peter McGovern, M.D., dated April 15, 1994, attached as Exh. H to Krouner Aff.); that her activities were limited for only the duration of her 1994 pregnancy, (*see* Grant Letter); and that she physically was able to return to work by January 1995, (*see* Lacoparra Dep. at 184–85; Continuing Disability Claim Forms, attached as Exh. I to Krouner Aff.). We find that this evidence is insufficient for purposes of summary judgment to establish that Lacoparra actually was "disabled" within the meaning of the ADA.

Nor can Lacoparra establish that she was "disabled" under the third prong of

**16.** *Compare Cerrato*, 941 F.Supp. at 392–93 (denying motion to dismiss where claimed disability was spotting, leaking, cramping, dizziness, and nausea); *Garrett v. Chicago Sch. Reform Bd. of Trustees*, No. 95–7341, 1996 WL 411319, at *3 (N.D.Ill. July 19, 1996) (denying motion to dismiss where claimed disability was pregnancy-related morning sickness); *Patterson v. Xerox Corp.*, 901 F.Supp. 274, 278 (N.D.Ill.1995) (denying motion to dismiss where claimed disability was back pain resulting from combination of pregnancy and prior injury) *with Wenzlaff v. NationsBank*, 940 F.Supp. 889, 891–92 (D.Md.1996) (granting motion to dismiss where claimed disability was pregnancy itself); *Gudenkauf v. Stauffer Communications, Inc.*, 922 F.Supp. 465, 474 (D.Kan.1996) (granting summary judgment where record established that plaintiff's pregnancy "was not unusual or abnormal" and related conditions "were not outside the normal range"); *Kindlesparker v. Metropolitan Life Ins. Co.*, No. 94–7542, 1995 WL 275576, at *1 (N.D.Ill. May 8, 1995) (denying motion to dismiss where plaintiff "experienced physical conditions related to pregnancy which required medical attention"); *Tsets-*

*eranos v. Tech Prototype, Inc.*, 893 F.Supp. 109, 119 (D.N.H.1995) (granting summary judgment where, "[a]lthough plaintiff's pregnancy was clearly complicated by her ovarian cysts, and these complications required her to be out of work for a period of time," the complications did not rise to level of a "disability").

**17.** That is not to say, however, that a woman is without recourse where her employer discriminates against her based on pregnancy related complications that do not render the woman "disabled" within the meaning of the ADA. Where pregnancy-related impairments do not rise to the level of a "disability," discrimination targeted at such conditions, while beyond the purview of the ADA, may nevertheless violate Title VII and the Pregnancy Discrimination Act. *See Johnson v. A.P. Products, Ltd.*, 934 F.Supp. 625, 627 (S.D.N.Y.1996); *Jessie v. Carter Health Care Ctr., Inc.*, 926 F.Supp. 613, 616 (E.D.Ky. 1996); *Villarreal*, 895 F.Supp. at 152; *Tsetseranos*, 893 F.Supp. at 119; *Byerly v. Herr Foods, Inc.*, No. 92–7382, 1993 WL 101196, at *4 (E.D.Pa.1993).

the ADA definition. Under this subjective, "perceived disability" standard, a plaintiff must show that her employer perceived her as having an impairment substantially limiting a major life activity. *See* 42 U.S.C. § 12102(2)(C); *Sherman v. New York Life Ins. Co.,* No. 96–9665, 1997 WL 452024, at *4 (S.D.N.Y. Aug.7, 1997); *see also Daley v. Koch,* 892 F.2d 212, 215–16 (2d Cir.1989) (Rehabilitation Act). That an employer deems an employee incapable of performing a particular job is insufficient; the employer must perceive the employee as generally unable to work. *Sherman,* 1997 WL 452024, at *4; *see also Daley,* 892 F.2d at 215–16. Here, Lacoparra has provided no evidence that Luckwaldt or Sottile, the Pergament managers who terminated Lacoparra, perceived her as having an impairment substantially limiting a major life activity. There is no indication that they ever were aware of the nature of Lacoparra's pregnancy-related complications or that they deemed her generally unfit to work. Consequently, Lacoparra was not "disabled" under the ADA by virtue of a "perceived" disability.

Moreover, even if Lacoparra could establish that she fits under any of the three prongs of the ADA's definition of disability, for the reasons discussed in section III of this Opinion we find that Lacoparra is utterly unable to demonstrate that she was discharged because of that disability and thus cannot establish a prima facie case of discrimination under the ADA. *Cf. Tsetseranos,* 893 F.Supp. at 119 ("even assuming that plaintiff's pregnancy and ovarian cyst problem constitute a disability under the ADA, . . . plaintiff has not produced sufficient evidence to establish a causal nexus between her disability and defendant's decision to terminate her").

## VI. *Sanctions under ERISA § 502(c)*

■ In her Fifth Cause of Action, Lacoparra requests that this Court impose statutory sanctions on Pergament for its delay in producing documents regarding its welfare benefits plan. Both Pergament and Lacoparra seek summary judgment on this claim.

Section 104(b)(4) of the Employee Retirement Income Security Act requires that an administrator of an employee benefits plan shall, upon written request of any participant, furnish a copy of the latest updated summary plan description. 29 U.S.C. § 1024(b)(4). ERISA § 502(c) provides that an administrator who fails or refuses to comply with such a request within 30 days may, in the court's discretion, be held personally liable to the participant. 29 U.S.C. § 1132(c)(1).

The statute commits the assessment of penalties to the district court's sound discretion. *Id.; Grohowski v. U.E. Systems, Inc.,* 917 F.Supp. 258, 261 (S.D.N.Y.1996). In determining whether a plaintiff is entitled to a statutory award, the two primary factors courts have considered are prejudice to the participant and bad faith on the part of the administrator. *See Grohowski,* 917 F.Supp. at 261–62; *Kascewicz v. Citibank,* 837 F.Supp. 1312, 1322–23 (S.D.N.Y.1993). Other factors include the length of the delay and the number of requests made by the plaintiff. *See Pagovich v. Moskowitz,* 865 F.Supp. 130, 137 (S.D.N.Y.1994).

In the instant action, Lacoparra contends that over one year elapsed between her request for summary plan documents and Pergament's compliance. In a letter dated November 2, 1994, from Todd Krouner (Lacoparra's attorney) to Donald Jacobson (Pergament's general counsel), Krouner requested a copy of summary plan documents (and the documents themselves) pertaining to Pergament's welfare benefits plan. (*See* Wenger Aff., Exh. C.) The bulk of the letter addresses Pergament's alleged failure to provide Lacoparra with adequate notice of the requirements of the FMLA. Jacobson's November 15, 1994 response states that "our log indicates that all legally required · notices were forwarded to your client in a timely manner." (Wenger Aff., Exh. D.) The letter does not explicitly mention or respond to the request for summary plan documents. Not until December 6, 1995— two months after Lacoparra commenced the instant action—did Pergament provide the relevant documents. The December 6 cover letter states: "Although the enclosed materials were provided to Ms. Lacoparra during her course of employment, we are providing

duplicate copies to you." (Wenger Aff., Exh. E.)

We find that sanctions are not warranted. To begin with, there is no evidence that Lacoparra was in any way prejudiced by Pergament's delay. Lacoparra does not contend that she was denied any benefits under the plan; she concedes that Pergament did not commit a substantive ERISA violation and has withdrawn this claim. (*See* Pl. Mem. at 26.) Moreover, although some courts have found that a plaintiff's need to initiate a lawsuit to determine her rights under a plan may constitute prejudice, *see Pagovich*, 865 F.Supp. at 138; *Kascewicz*, 837 F.Supp. at 1323, Lacoparra's reliance on these holdings is without merit. She commenced the instant action not because any withholding of plan documents interfered with her entitlements under the plan, but rather to seek redress for Pergament's alleged discrimination.

In addition, we find no basis on which to conclude that Pergament's failure to provide the plan documents reflected bad faith "rather than possible confusion or sloppiness." *Algie v. RCA Global Communications, Inc.*, 891 F.Supp. 839, 870 (S.D.N.Y.1994), *aff'd*, 60 F.3d 956 (2d Cir.1995). In most cases in which § 502(c) sanctions have been awarded, the defendant failed to respond to numerous requests from the plaintiff. *See, e.g., Scarso v. Briks*, 909 F.Supp. 211, 215 (S.D.N.Y. 1996); *Pagovich*, 865 F.Supp. at 138. Here, the record suggests that Lacoparra's attorney requested summary plan documents once, in his November 2, 1994 letter. This request came at the end of a letter that primarily addressed Pergament's alleged failure to provide FMLA information. At no point does Lacoparra seem to have followed up on this request. Indeed, Pergament provided the documents only after learning that Lacoparra was seeking § 502(c) sanctions in her complaint. Between the November 2 request and the filing of the complaint, it appears that Lacoparra did not pursue her request or give Pergament any indication that she still needed and desired the information. Indeed, the absence of a substantive ERISA claim in her original complaint suggests that she did not in fact need or want the summary plan documents. In light of all these considerations, we find nothing from which to infer bad faith.

Under the circumstances, any award to Lacoparra, "where the absence of either bad faith or prejudice is so palpable, would be an unjustifiable windfall." *Grohowski*, 917 F.Supp. at 262. Therefore, Pergament's motion for summary judgment on the ERISA § 502(c) claim is granted. Accordingly, Lacoparra's cross-motion for summary judgment on this claim is denied.

## VII. *Intentional Infliction of Emotional Distress*

■ Finally, Lacoparra's Seventh Cause of Action asserts a pendent state claim for intentional infliction of emotional distress ("IIED"). This claim is spurious.

■ First, there is no tort cause of action in New York for abusive or wrongful discharge of an at-will employee. *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293, 461 N.Y.S.2d 232, 236, 448 N.E.2d 86, 90 (1983). Based on this principle, it is well-established that a plaintiff may not subvert the rule "by recasting [her] cause of action in terms of a tort of intentional infliction of emotional distress." *Id.; see also Stylianou v. St. Luke's/Roosevelt Hosp. Ctr.*, 902 F.Supp. 54, 58 (S.D.N.Y.1995); *Tischmann v. ITT/Sheraton Corp.*, 882 F.Supp. 1358, 1367 (S.D.N.Y.1995). Here, Lacoparra's vaguely pleaded and sparsely briefed IIED claim involves no factual allegations independent of those relating to her termination. *See Tischmann*, 882 F.Supp. at 1368 (granting summary judgment on IIED claim where claim "merely rehash[ed] the same facts regarding [defendant's] decision to terminate [plaintiff]").

In any event, Lacoparra's allegations fall woefully short of establishing a cause of action for New York's extremely limited IIED tort. New York, which has adopted the Restatement (2d) of Torts definition of IIED, requires that the defendant's conduct be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."

*Martin v. Citibank,* 762 F.2d 212, 220 (2d Cir.1985) (quoting Restatement (2d) Torts § 46(1) (1965), as adopted by *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215, 1217 (1978)). An IIED claim has four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the outrageous conduct and injury; and (4) severe emotional distress. *Howell v. New York Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993).

Lacoparra is unable to satisfy, even remotely, any of the tort's elements. *Cf. Sigmon v. Parker Chapin Flattau & Klimpl,* 901 F.Supp. 667 (S.D.N.Y.1995) (granting motion for summary judgment on IIED claim in Title VII case where plaintiff alleged, *inter alia,* that she was terminated and otherwise discriminated against because of her pregnancy and gender). Accordingly, summary judgment is granted in favor of Pergament with respect to the IIED claim.

### Conclusion

For the foregoing reasons, Pergament's motion for summary judgment is granted with respect to all claims, and Lacoparra's cross-motion for summary judgment on the ERISA § 502(c) claim accordingly is denied. The Amended Complaint is dismissed in its entirety. Pergament shall submit a proposed Judgment Order within ten days and Lacoparra shall have five days to file objections as to form.

SO ORDERED.